# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| DANIEL J. CARRO, | **Civil Case No.** |
| Plaintiff, | |
| v. | **SHAREHOLDER DERIVATIVE COMPLAINT** |
| MARY T. BARRA, DANIEL F. AKERSON, MICHAEL P. MILLIKIN, AND JOHN CALABRESE, | |
| Defendants, | |
| -and- | |
| GENERAL MOTORS COMPANY, | **JURY TRIAL DEMANDED** |
| Nominal Defendant. | |

Plaintiff Daniel J. Carro, by his undersigned attorneys, for his verified shareholder derivative complaint, alleges upon information and belief, except as to allegations about himself, which are based upon personal knowledge, as follows, upon the investigation of counsel. This investigation included the review of information relating to the relevant time period obtained from public and proprietary sources – including, *inter alia*, United States Securities and Exchange Commission ("SEC") filings, court filings in civil, regulatory and criminal proceedings, internal corporate documents obtained by plaintiff pursuant to Delaware law, public reports, press releases, news articles and other media reports. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF ACTION

1.      This is a shareholder derivative action on behalf of nominal defendant General Motors Company ("GM" or "the Company") against certain of its current and former officers. This case arises out of the now infamous ignition switch disaster which has cost GM billions of dollars and counting.

2.      As alleged herein, beginning in or around 2002, GM sold millions of cars to unsuspecting consumers with a dangerous ignition switch safety defect that caused the vehicles to suddenly shut down without warning while disabling the airbags, including at highway speeds. While red flags about the defect were evident at GM as early as 2003-2004, GM's management, including defendants herein, failed to timely detect the problem, failed to ensure that the problem was appropriately addressed, ignored the implications of the defect as the evidence mounted that a serious safety problem was at hand, and affirmatively misled regulators, the public and the Company's shareholders even once the scope of the problem was fully known inside GM.

3.      In the wake of the ignition switch revelations in early 2014, GM retained Antonio Valukas ("Valukas"), a partner at Jenner & Block, to conduct what was described as an unvarnished investigation of the facts and circumstances surrounding the ignition switch. In a report dated May 29, 2014 entitled Report to the Board of Directors of General Motors Company Regarding Ignition Switch Recalls ("Valukas Report"), Valukas provided a detailed chronology exposing a total breakdown of the Company's risk, safety and recall practices -- which were so bad that the ignition switch problem was ultimately exposed not by GM itself, but by investigators and experts retained by plaintiffs lawyers in personal injury litigation arising from vehicle accidents.

4.      As detailed below, starting no later than 2002, GM manufactured and sold several models of vehicles based on a common "Delta" platform equipped with the defective ignition switch. Problems with moving shutdowns became apparent almost immediately. Notwithstanding clear

internal and legal directives that this phenomenon constituted a safety problem requiring immediate recall, GM papered over the issue with a false and misleading 2005 service bulletin to consumers, and a redesign of the subject switch in 2006 -- but only for new cars.

5.      By approximately the spring of 2012, certain GM personnel knew that the defective switch could also cause frontal airbag non-deployment in at least some model years of the Chevrolet Cobalt, and were aware of several fatal incidents and serious injuries that occurred as a result of accidents in which the defective switch caused or contributed to airbag non-deployment. This knowledge extended well above ranks of investigating engineers to, at least, certain supervisors and attorneys at the Company. Yet GM failed to report the problem to the National Highway Transportation Safety Administration ("NHTSA"), as required, for almost 2 years. And throughout this period, GM failed to correct the 2005 service bulletin stating that the subject ignition switch, which caused moving shutdowns, posed no "safety" problem for drivers.

6.      In addition to dozens of fatalities caused by the defective ignition switch and GM's subsequent delay and obfuscation, GM's belated recall of the unsafe cars has led to massive corporate losses, including a maximum $35 million penalty to NHTSA, the largest sum the regulator may legally impose on a car manufacturer. In September 2015, it was announced that GM would pay a **$900 million forfeiture** in connection with a deferred prosecution agreement ("DPA") entered into with U.S. Attorney Preet Bharara of the Southern District of New York. As Mr. Bharara stated, "to sum it up, they didn't tell the truth in the best way that they should have, to their regulators, to the public, about the serious safety defects that risked life and limb."

7.      In addition to causing or allowing these illegal and reckless practices to occur, defendants actively misled GM's own shareholders about GM's business and operations. In recent years, GM has stated that "[k]eeping drivers and passengers safe in and around vehicles is a ***top***

3

*priority* for our company." GM has stated that "[o]ur customers' peace of mind is ***the most important thing***" and "***it's their safety that we have in mind.***" GM has stated that its approach to "safety and occupant protection is one of ***the most comprehensive*** in the industry" and that "[h]ow a vehicle performs in the real world is ***an important source*** of information for driving continuous improvement and innovation in vehicle safety." These statements were false and indefensible.

8.     In September 2015, it was announced that GM would settle claims for securities fraud pending against it (and some defendants named herein) in the action captioned *New York State Teachers' Retirement System v. General Motors Company, et al.*, No. 14-cv-11191 (E.D. Mich.) (the "Securities Class Action").  In that case, plaintiffs alleged that GM's officers issued false statements regarding the Company's liabilities, internal controls, and purported commitment to safety, and in doing so acted with scienter, or intent to defraud stock purchasers. GM paid **$300 million** to purchasers of GM stock between 2011 and 2014 to settle these claims, without even awaiting the outcome of its pending motion to dismiss, a highly unusual circumstance given the stringent pleading standards imposed on plaintiffs by the Private Securities Litigation Reform Act of 1995 ("PSLRA").

9.     In addition to these massive payments, GM continues to be exposed to billions of dollars more in charges and damages arising out of class action and personal injury litigation which is ongoing. In addition, pursuant to the GM Ignition Compensation Claims Resolution Facility administered by Kenneth Feinberg, GM has offered approximately $600 million to injury claimants. According to Mr. Feinberg, as of late 2015, over 120 death claims had been paid.

10.     As defendant Mary T. Barra ("Barra") admitted in March 2014, "something went wrong with our process in this instance and terrible things happened." Barra further admitted to a culture that put profits over safety. These events raised immediate questions as to whether GM's senior managers fulfilled their fiduciary duties of (a) prudent and effective design and management of the Company's

operations, and (b) full and honest disclosure to shareholders. As alleged herein, they did not.

11.    On April 30, 2015 plaintiff made a demand on the Board of Directors of GM to sue the parties at the Company responsible for this fiasco. The Board failed to act. Instead, in a letter to plaintiff dated June 24, 2015, a GM lawyer stated that the Board would await a ruling in a factually similar shareholder derivative action pending in the Delaware Chancery Court before responding to the demand. In that case, the plaintiffs *failed* to make a demand, and GM moved to dismiss the complaint for failure to allege demand futility. On June 26, 2015, the Delaware Chancery Court dismissed the complaint for failure to allege demand futility with sufficient particularity.

12.    Rather than promptly acting on plaintiff's demand at that time, as the Board had stated it would do in its June 24, 2015 letter, by letter dated September 15, 2015, a GM lawyer advised plaintiff that the Board would *again* defer consideration of plaintiff's demand because the Delaware plaintiffs had taken an appeal. According to the September 15, 2015 letter, the Board wanted to await the "disposition" of the appeal before taking any further steps.

13.    Plaintiff in this case has made a proper demand and the Board's delay in asserting GM's rights has become untenable. The Board's stalling and failure to act for an indefinite period as GM's huge losses continue to mount due to defendants' misconduct is not reasonable or in good faith.

14.    This action seeks to recoup the losses that GM has sustained, and will continue sustaining, in connection with the ignition switch disaster and all related proceedings.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because complete diversity exists between plaintiff and each defendant and the amount in controversy exceeds $75,000 exclusive of interest and costs. This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

16.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, a citizen of Michigan, or is an individual with sufficient minimum contacts with this District so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because GM maintains its principal place of business in this District, one or more of the defendants resides in or maintains executive offices in this District, a substantial portion of the transactions complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

18.     Plaintiff Daniel J. Carro ("Carro") is a current holder of GM stock and held his shares during the relevant period alleged herein. Carro is a citizen of New York.

**Nominal Defendant**

19.     Nominal Defendant GM is a Delaware corporation with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of the States of Delaware and Michigan. "New" GM was incorporated in 2009 and, effective on July 11, 2009, acquired substantially all assets and assumed certain liabilities of "old" GM.

**Individual Defendants**

20.     Defendant Barra is currently GM's Chairman and CEO. For over 33 years, Barra has worked for or been affiliated with GM and has been described as a GM "lifer." Barra began her career with GM in 1980 as a General Motors Institute co-op student at the Pontiac Motor Division. In 1990, Barra graduated with a Masters in Business Administration from the Stanford Graduate School of

6

Business after receiving a GM fellowship in 1988. After graduating from business school, Barra returned to GM and served in various roles at the Company. By 2004, as GM was preparing to launch the 2005 Cobalt, Barra was plant manager of the Company's Detroit-Hamtramck plant, which made Cadillacs, Buicks and Pontiacs. Then, as Executive Director, and later Vice President, of Manufacturing Engineering from 2004 to 2009, Barra worked to overhaul and streamline GM's production plants and processes in order to "trim development costs and move products to market quicker." Barra then served as Senior Vice President, Global Product Development from 2011 to 2013, and then Executive Vice President, Global Product Development, Purchasing & Supply Chain from August 2013 until her January 15, 2014 appointment as CEO. The executives in both of these positions are referred to as GM's "Product Chief" and in that role Barra was responsible for the design, engineering, program management and quality of GM vehicles around the world. On information and belief, Barra is a citizen of Michigan.

21.    Defendant Daniel F. Akerson ("Akerson") is a former CEO of GM, having succeeded Edward Whitacre, Jr. as CEO of GM and assumed the position of Chairman of GM's Board in January 2011. On information and belief, Akerson is a citizen of Virginia.

22.    Defendant Michael P. Millikin ("Millikin") became Senior Vice President and General Counsel of GM in July 2009, after more than three decades in various positions in GM's legal department. In October 2014, it was announced that Millikin would "retire" from GM. On information and belief, Millikin is a citizen of Michigan.

23.    Defendant John Calabrese ("Calabrese") was at relevant times Vice President Global Vehicle Engineering. On April 22, 2014, Calabrese, who had been with GM for more than 33 years and had been Vice President of Global Vehicle Engineering since April 2011, "elected to retire." On information and belief, Calabrese is a citizen of Michigan.

24.    Defendants Barra, Akerson, Millikin and Calabrese are sometimes referred to as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### I.    Company Background.

25.    GM was founded in 1908 and is based in Detroit, Michigan. GM is an automobile manufacturer that designs and engineers vehicles. GM currently produces, sells and services its vehicles through its numerous brands in more than 120 countries around the world, including the Chevrolet, Buick, GMC, and Cadillac brands. By 2001, GM's U.S. market share had fallen to approximately 20%, and global competitors and the 2008 financial crisis contributed to the Company's increasingly critical cash flow problems.

26.    In the face of these challenges, GM reduced costs by cutting production, pressuring suppliers to lower costs, reducing health care and pension spending, and reducing its workforce. As a cost-cutting measure, in 2004, GM decreased its engineering headcount by consolidating 11 engineering centers in the U.S. into one unit and adding to the responsibilities of its engineering personnel. This created an environment in which GM's engineers were overworked, one person was required to do the job of many, and the quality of the engineers' work suffered accordingly.

27.    On June 1, 2009, GM filed for bankruptcy protection. On July 10, 2009, GM emerged from bankruptcy protection with formal assistance of the U.S. government, which made a substantial capital investment in the Company. The "new" GM acquired many of "old" GM's key assets, including the four core U.S. brands: Chevrolet, Buick, GMC, and Cadillac.

28.    After the bankruptcy, GM claimed that it had emerged as a new and improved organization. In the Company's 2010 Annual Report, dated March 1, 2011, the Company assured shareholders that "we truly are building a new GM, from the inside out. Our vision is clear: to design,

build and sell the world's best vehicles, and we have a new business model to bring that vision to life. We have a lower cost structure, a stronger balance sheet, and a dramatically lower risk profile. We have a new leadership team – a strong mix of executive talent from outside the industry and automotive veterans – and a passionate, rejuvenated workforce."

29.     GM also claimed that it had a new "culture" and a "new attitude," touting that "we are making major strides in becoming a GM that works smart, thinks big and moves fast. The GM culture values simplicity, agility and action – making and implementing decisions faster, pushing accountability deeper into the organization and demanding results from everyone."

30.     Similarly, in the Company's 2011 Annual Report dated February 27, 2012, GM claimed that it was putting its customers first, stating that "Every driver of a GM car … is a driver of our growth. We're putting our vision in motion by putting our customers first – executing our strategy to attract and delight more of them every day, all over the world."  GM also announced that it was dedicated to leadership in vehicle safety, stating that "We are committed to leadership in vehicle design, quality, reliability, telematics and infotainment and safety."

31.     GM made many statements such as this during the relevant period in SEC filings, public statements and product advertising. As detailed below, GM's assurances about its business, operations and commitment to "safety" were totally false.

## II.     Chronology of the Ignition Switch Defect.

### a. Summary.

32.     The ignition switch defect at issue is a low-torque ignition switch installed in many GM vehicles which, under certain circumstances, may move out of the "Run" position. If this movement occurs, the driver loses the assistance of power steering and power brakes. And if a collision occurs while the switch is in the Accessory or Off position, the vehicle's safety airbags may fail to deploy—

9

increasing the risk of death and serious injury in crashes in which the airbag was otherwise designed to operate. Many of the impacted model year cars were based on GM's uniform "Delta" automobile platform, and included the 2005, 2006, and 2007 Chevrolet Cobalt; the 2005, 2006, and 2007 Pontiac G5; the 2003, 2004, 2005, 2006, and 2007 Saturn Ion; the 2006 and 2007 Chevrolet HHR; the 2007 Saturn Sky; and the 2006 and 2007 Pontiac Solstice.

33.    Before the defective switch went into production in 2002, certain GM engineers knew that it was prone to movement out of the Run position. Testing of a prototype showed that the torque return between the Run and Accessory positions fell below GM's own internal specifications. But the engineer in charge of the defective switch approved its production anyway.

34.    In or about 2004 and 2005, as GM employees, media representatives, and GM customers began to experience sudden stalls and engine shutoffs caused by the switch, GM considered fixing the problem. However, having decided that the switch did not pose a safety concern, and citing cost and other factors, engineers opted to leave the switch as it was and simply promulgate an advisory to dealerships with tips on how to minimize the risk of unexpected movement out of the Run position. GM even rejected a simple improvement to the head of the key that would have significantly reduced unexpected shutoffs at a price of less than $1 per car.

35.    At the same time, in or about June 2005, GM issued a statement that acknowledged circumstances where the ignition key could inadvertently move to the Accessory or Off position when the engine was running. In response to a further inquiry, GM informed a newspaper that GM did not believe the inadvertent rotation of the ignition key was a safety issue.

36.    From approximately the spring of 2012, certain GM personnel knew that the switch presented a safety defect because it could cause airbag non-deployment associated with death and serious injury. Yet not until approximately 20 months later, in February 2014, did GM first notify

10

NHTSA and the public of the connection between the problem switch and fatal airbag non-deployment incidents. This announcement accompanied an initial recall of approximately 700,000 vehicles—a number that would grow to more than 2 million by March 2014.

37.     Inside GM, certain personnel responsible for shepherding safety defects through GM's internal recall process delayed this recall until GM could fully package, present, explain, and handle the deadly problem, taking affirmative steps to keep the matter outside the normal process. On at least two occasions while the condition was well known by some within GM but not disclosed to the public or NHTSA, certain GM personnel made incomplete and misleading presentations to NHTSA assuring that GM would and did act promptly, effectively, and in accordance with its formal recall policy to respond to safety problems—including airbag-related safety defects.

38.     For much of the period during which GM failed to disclose this safety defect, it not only failed to correct its 2005 assurance that the switch posed no safety concern, but also actively touted the reliability and safety of cars equipped with the switch, with a view to promoting sales of used GM cars. Although GM sold no new cars equipped with the switch during this period, GM dealers were still, from in or about the spring of 2012 through in or about the spring of 2013, selling pre-owned Chevrolet, Pontiac, and Saturn brand cars that would later become subject to the February 2014 recalls. These sales were accompanied by certifications from GM, assuring the unwitting consumers that the vehicles' components met all safety standards.

### b. The Regulatory System and GM's Recall Procedures.

39.     NHTSA is a federal agency charged with ensuring that manufacturers of motor vehicles comply with the safety standards contained in the National Traffic and Motor Vehicle Safety Act of 1966, codified at 49 U.S. Code Chapter 31 (the "Safety Act").

40.     Under applicable regulations, GM was required to disclose to NHTSA any "defect . . .

related to motor vehicle safety," defined as "performance of a motor vehicle . . . in a way that protects the public against unreasonable risk of accidents . . . and against unreasonable risk of death or injury in an accident." Such disclosure had to be "submitted not more than 5 working days after a defect in a vehicle or item of equipment ha[d] been determined to be safety related."

41.     The required disclosure was to be made by filing a "Defect Information Report" or "DIR" with NHTSA. An auto manufacturer's filing of a DIR with NHTSA is commonly referred to as a "recall." GM had a formal recall decision-making process, called the Field Performance Evaluation or "FPE" process, the steps of which were well documented. According to Company policy, the FPE process was supposed to be initiated by dedicated engineers in the Product Investigations ("PI") group, which was at all relevant times headed by GM's Director of Safety & Crashworthiness or Director of Product Investigations, who was responsible for identifying and investigating suspected safety and compliance problems with GM cars.

42.     Once PI had completed its investigation of a safety problem, it would hand the matter off from the engineering side to the "Quality" organization—specifically, to the "FPE Director." This meant presenting the problem at a weekly Investigation Status Review ("ISR") meeting attended by the FPE Director, GM's Director of Safety & Crashworthiness or Director of Product Investigations, and a member of GM's legal department.

43.     If, based on PI's presentation at the ISR, these individuals believed that the matter involved a potential safety defect, they were to advance it for consideration by the Performance Field Evaluation Team ("PFET"). The PFET had no recall decision-making authority but was tasked with gathering information needed to execute a potential recall.

44.     At roughly the same time that the PFET was apprised of the issue, the matter was also supposed to go before the Field Performance Evaluation Review Committee ("FPERC").

The FPERC would make a preliminary decision about whether the issue under consideration qualified as a "defect . . . related to motor vehicle safety" and warranted a recall. It would then transmit to its conclusion to the decision-making body, the Executive Field Action Decision Committee ("EFADC"), which was made up of three GM Vice Presidents.

45.     Typically, the EFADC's decision would follow within approximately a week of the FPET's and the FPERC's consideration of the matter. If the EFADC voted for a recall, the decision would be reported to NHTSA within five business days, at which time a DIR would  also be filed.

### c.   Warning Signs from Inception.

46.     In the early 2000s, GM launched a series of compact cars that it marketed as affordable, safe, and fuel-efficient. One of these small cars was the Saturn Ion. Another was the Cobalt. These two models belonged to GM's "Delta" platform, and from their respective launches until around late 2006 both were equipped with the defective ignition switch. The defective ignition switch would also be installed in other, less popular Chevrolet, Saturn, and Pontiac models from about 2004 through about late 2006.

47.      Development of the switch that would end up first in the Ion and then Cobalt and the other models began in the late 1990s. By March 2001, the GM design engineer then in charge of the Ion's switch had designed the specifications and communicated them to the supplier. Among the specifications communicated to the supplier was the minimum torque necessary to move the switch from Run to Accessory. This torque performance was to be maintained by a detent plunger and spring within the switch.

48.     Testing conducted by the supplier in 2001 and early 2002 revealed that an early version of the pre-production switch was not meeting the torque specification; it repeatedly

13

scored "Not OK." A July 2001 pre-production report for the Ion within GM made the same observation: the switch had "low detent plunger force."

49.     In email correspondence between the engineer and the supplier in early 2002, the supplier confirmed that an early version of the switch was not meeting the torque specification and outlined the problems that might arise if the part were brought into compliance—including pressure on other switch components, delay, and increased costs.

50.     Saying that he was "tired of the switch from hell" and did not want to either compromise the electrical performance of the switch or slow the production schedule, the design engineer directed the supplier to "maintain present course" notwithstanding that there was "still too soft of a detent." Accordingly, the defective switch was put into production and installed into the first model year of the Ion (model year 2003), which was first sold to the public in 2002. By email dated March 28, 2002, the design engineer recommended that the switch also be used in the Cobalt, which was yet to launch.

51.     Almost immediately, customers began to report problems with cars equipped with the defective switch. Remarkably, GM employees tasked with driving early production models of the Ion and then the Cobalt were reporting stalls while driving, and some of them were attributable to easy rotation of the key within the defective switch.

52.     Members of the press covering the Cobalt's launch also experienced the unexpected shutoff problem. Alerted by one of the press reports, two GM managers in charge of safety determined to experience the phenomenon for themselves. In June 2005, they test drove a Cobalt and found that, as reported, contact with the driver's knee could lead to a stall.

53.     Shortly afterward, GM issued a press statement acknowledging the problem as it pertained to the Cobalt, which had the greatest number of consumer complaints. According to the

statement, "In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is running." The press release further recommended that drivers remove "nonessential material from their key rings." Before its public release, this statement was reviewed and approved by various GM officials. In a response to further media inquiry, GM stated that it did not believe this condition presented a safety concern.

54.     A June 2005 Cleveland Plain Dealer article reporting on the ignition switch problem commented that "you have to admit it is pretty funny to hear somebody pretend that turning off the engine by mistake isn't a safety issue." Just days before this article was published, GM engineers working on the Pontiac Solstice, another new car equipped with the defective switch, learned of a complaint about a Solstice that had experienced the same inadvertent shutoff problem as had been reported in the Ion and the Cobalt.

### d.   The Misleading 2005 Service Bulletin.

55.     In November 2004, the Company opened the first of several engineering inquiries that would be initiated in the ensuing years to address the problem. This first inquiry was closed "with no action" in March 2005. Fixes such as improving the torque performance of the defective switch itself and changing the head of the associated key were rejected as not representing "an acceptable business case." GM engineers concluded that each proposed solution would take too long to implement, would cost too much, and would not fully fix "the possibility of the key being turned (ignition turn off) during driving."

56.     Not all involved in the November 2004 engineering inquiry agreed with this outcome. One manager for the Cobalt believed that the switch presented a potential safety problem because it could cause sudden loss of power steering and power brakes. He thought a

15

remedy should have been implemented without regard to cost concerns.

57.    Meanwhile, in February 2005, while the November 2004 engineering inquiry was still open, the Company released a "Preliminary Information" to its dealers aimed at helping them diagnose and address the defective switch problem. This publication explained that "key ignition cylinder torque/effort" could cause "Engine Stalls."

58.    In May 2005, just two months after the November 2004 engineering inquiry into the defective switch was closed without action, a GM brand quality manager opened a second inquiry to consider fixing the problem, but only for new cars. This manager cited a customer complaint that the "vehicle ignition will turn off while driving," and noted that GM was having to buy back Cobalts as a result of the defective switch.

59.    Still not believing this was a safety issue, GM engineers closed this inquiry too, without issuing a recall. Although GM engineers initially resolved to fix the low torque problem for newly produced 2007 Cobalts by changing the design of the key head so that the key ring would sit in a "hole" rather than a "slot," they ultimately rejected this solution. GM continued selling new cars equipped with the defective switch and slot-head key.

60.    Meanwhile, GM's PI group, which was responsible for addressing problems with cars already on the road, began to study the low torque issue in the summer of 2005. Like the engineering inquiries targeting new cars, this investigation essentially went nowhere. Although PI engineers presented the matter to the ISR (the first stage of the potential recall process), it was decided that the problem did not present a safety concern and thus did not warrant further consideration for a recall. At the time, neither PI nor any member of the ISR recognized that the airbag system was among the electronic systems disabled by the defect.

61.    Having determined that the problem did not pose a safety concern and thus need

not be considered further for recall, GM simply replaced the February 2005 Preliminary Information with a more formal "Service Bulletin" to its dealers, alerting them to an "inadvertent turning off" problem and instructing them to provide any complaining customers with inserts that would transform the key slot into a hole and thus reduce the lever arm. Unlike the Preliminary Information, which accurately described the condition caused by the defective switch as a "stall," the 2005 Service Bulletin omitted that word. Thus, a dealer responding to a customer inquiry would not locate the bulletin if he or she only used the word "stall" in the search.

62.    The omission of the word "stall" from the 2005 Service Bulletin was deliberate. The PI senior manager, who oversaw and could control the wording of GM service bulletins, directed that the word be kept out of this bulletin even though he knew customers would naturally describe the problem as "stalling." The reason for the omission was to avoid attracting the attention of GM's regulator, NHTSA. As it happened, in the interim between the February 2005 Preliminary Information and the 2005 Service Bulletin, some within GM had been meeting with representatives of NHTSA to try to persuade them that defects causing vehicles to stall were not necessarily safety defects warranting recall action.

63.    Although the bulletin referenced not just the Cobalt, and although it was updated in October 2006 to cover model year 2007 versions, only about 430 customers would ultimately receive the bulletin's recommended key-head inserts between 2005 and 2014.

64.    As of the spring of 2006, the 2005 Service Bulletin was the lone measure in place to address the defective switch. There were no systematic efforts to provide key modifications for all owners of affected cars—or even all owners who came into dealerships for service. And every day more and more new cars with the defective switch were being sold.

### e.   The Switch is Redesigned.

65.    In April 2006, the original design engineer authorized a replacement switch for new cars with significantly greater torque. The engineer further directed, in contravention of accepted GM practice, that this change be implemented without a corresponding part number change. As a result, no one looking at the switch would be able to tell the difference between the old, defective switch and the new, non-defective one, without taking it apart.

66.    Although it was effectuated without a part number change, the switch change was documented internally, and other engineers were aware of it at the time and afterward. For example, a March 2007 note logged in connection with an engineering inquiry into another matter related to the Ion specifically observed that "[t]he detent plunger torque force was increased" by the original design engineer in April 2006.

67.    Another relevant change to the Cobalt was made in 2009. Having previously rejected the slot-to-hole alteration to the key head design, GM finally decided to implement that change. An engineer involved in the decision wrote at the time: "This issue has been around since man first lumbered out of [the] sea and stood on two feet." This change went into effect for the model year 2010 Cobalt.

### f.   Accident Litigation.

68.    As GM acknowledged in its 2005 Service Bulletin, the defective switch could result in a "loss of electrical system[s]." These electrical systems included power steering and power brakes, but also the diagnostic module or "SDM" in the vehicle, which controlled airbag deployment. Internal GM documents reflect that certain employees understood by 2001 that there was a connection between a loss of electrical systems and non-deployment of airbags.

69.    The deadly effects of the defective switch began manifesting themselves early on.

In July 2004, a driver died in a crash of an Ion after her airbags failed to deploy. A few months later, in November 2004, the passenger of a 2004 Ion died in another crash where the airbags failed to deploy. In June 2005, a driver suffered serious injuries after his 2005 Ion crashed and the airbags failed to deploy. For each of these incidents, the SDM data recovered from the crashed vehicles proved uninformative because, unlike the SDM installed the in the Cobalt, the Ion's SDM was incapable of recording data after the vehicle had lost power.

70.     The Cobalt SDM data, by contrast, reflected a number of non-deployments accompanied by a power mode status recording of Accessory or Off. In July 2005, just months after GM closed its first engineering inquiry into the defective switch, a 16-year-old driver died in Maryland when the airbags in her 2005 failed Cobalt to deploy. The power mode status recorded for that vehicle at the time of the crash was Accessory.

71.     In October 2006, two more teenagers died, also in a 2005 Cobalt, in Wisconsin, when the airbags failed to deploy. The police officer who examined the crashed vehicle noted in a February 2007 accident report that the ignition switch "appeared to have been in the accessory position . . . preventing the airbags from deploying." An April 2007 report about the same crash prepared at Indiana University likewise posited that the airbags had failed to deploy because the key was in the Accessory position. This report even specifically referenced the October 2006 version of the 2005 service bulletin, which described the defective switch.

72.     In the spring of 2007, NHTSA approached GM to express concern about the high number of airbag non-deployment complaints in Cobalts and Ions. Around this same time, and as a result of NHTSA's inquiries, a GM field performance assessment engineer with expertise in airbags who worked with GM's lawyers began to track reports of crashes in Cobalts where the airbags failed to deploy. In May 2007, the PI group even placed the issue of Cobalt airbag non-

19

deployment into the first stage of GM's recall process, but no follow-up occurred.

73.     In September 2008, a crash involving a 2006 Cobalt killed two people when the airbags failed to deploy. GM sent the car's SDM to the Company's SDM supplier for examination. In May 2009, the SDM supplier reported that the power mode status was recorded as Off, and that this was one of two possible explanations for the failure of the airbags to deploy. This report was provided in writing and in person at a meeting attended by several GM employees—including a member of the PI group, in-house counsel, and the field performance assessment engineer who had been tracking the Cobalt non-deploy incidents.

74.     By March 2010, GM had conducted a safety recall for a power steering problem in the Cobalt unrelated to the defective switch, in which it acknowledged that loss of power steering, standing alone, constituted a "defect . . . relate[d] to motor vehicle safety" and thus warranted recall action. The defective switch caused this same problem, as was specifically acknowledged by GM. Yet at no time before February 2014 did GM announce a recall for cars associated with the defective switch.

75.     Many of the deaths and serious injuries associated with airbag non-deployment became the subject of legal claims against GM. Cobalt and Ion non-deployment cases began reaching GM's legal staff in late 2005 and 2006. GM had a structured settlement process to deal with accident litigation by which GM decided whether and for how much a case should be settled.

76.     At the lowest monetary level, product litigation staff attorneys were vested with $100,000 in settlement authority. Settlements of between $100,000 and $ 1.5 million (later increased to $2 million) required approval at a committee known as the Roundtable. The Roundtable Committee met weekly and all product litigation staff attorneys were invited to attend. Settlement offers between $2 and $5 million required approval of a group called the Settlement Review Committee ("SRC"), which met monthly, and was chaired by the head of global litigation.  Cases

over $5 million required approval by the GM's General Counsel – defendant Millikin.

77.    Certain GM lawyers, aided by the field performance assessment engineer and others who assisted in evaluating causes of crashes, realized by no later than early 2011 that a number of the non-deployment cases involved an "anomaly" in the ignition switch.

78.    Specifically, in connection with a crash in Tennessee, a GM engineer explained to legal staff that when the ignition switch power mode status is in Off (as it was in that case), the SDM "powers down," and the airbags fail to deploy. The engineer further opined that "a crash sensing system 'anomaly'" resulting in a power mode status of Off had indeed caused non-deployment in that case. GM promptly settled the Tennessee case.

79.    Just days before that settlement, a 15 year old girl in South Carolina crashed her mother's 2007 Cobalt and suffered significant injuries when the airbag did not deploy. The power mode status was recorded as Accessory at the time of the crash. GM engineers evaluating the crash theorized that, as in the case of the Tennessee crash, the non-deployment may have been caused by a crash sensing "anomaly" related to the ignition switch.

80.    Meanwhile, the GM attorney principally responsible for airbag non-deployment claims had become familiar with a number of Cobalt non-deployment incidents, and grew concerned that the "anomaly" was getting insufficient attention from the PI group, which was supposed to investigate and fix safety problems with cars on the road. At the time, no one within GM had yet sourced the "anomaly" to the defective switch's torque problem.

81.    Certain members of the legal department took the unusual step of arranging a meeting with PI. The meeting, which took place on July 27, 2011, was attended by the PI senior manager and the Director of Product Investigations. Also present were the field performance assessment engineer, a GM airbag attorney, and a GM safety attorney. In advance of the meeting, the PI senior manager wrote to a colleague that the Cobalt airbag non-deployment

21

problem was "ugly" and would make for "a difficult investigation."

82.     At the July 27, 2011 meeting, the field assessment performance engineer showed photographs of three of the most serious non-deployment crashes he had seen involving Cobalts and specifically highlighted his observations that many of the Cobalt non-deployment crashes had occurred while the power mode was in the Accessory or Off position.

83.     After the meeting, one of the first steps PI took was to gather information from the engineer who had been tracking non-deployment incidents in Cobalts since 2007, and who had been involved in evaluating a number of crashes that were the subject of Cobalt non-deployment legal claims. The engineer explained to the PI investigator that he had observed that in some cases the power mode was recorded as either Accessory or Off at the time of the crash. The engineer further noted that the non-deployment problem appeared to be limited to 2005-2007 model years of the Cobalt and appeared not to affect model years 2008 and later.

### g.   Additional Investigation.

84.     By March 2012, more than six months after he had been assigned to the matter, the PI investigator had done little to advance the investigation. During a meeting with several GM employees, the PI investigator complained that he needed more support from GM's electrical engineering group to investigate a potential electrical (as opposed to mechanical) explanation for the Accessory and Off power mode recordings in many of the subject crashes.

85.     Two weeks later, the field performance assessment engineer, members of GM's electrical engineering group, and others travelled to an auto salvage yard to examine whether the Accessory and Off power mode status recordings within the SDMs were attributable to an electrical "bounce" in the ignition switch. Following this investigation, a GM electrical engineer reported his view that a probable root cause of the non-deployment problem was the switch

22

moving out of Run to Accessory or Off.

86.     In an April 23, 2012 email responding to a query about an ignition switch turning too easily from Run to Off, the PI senior manager wrote to colleagues claiming that he had "not heard of" complaints about low torque in the "Cobalt or other models" since 2005, when the first PI examination was conducted and closed with the issuance of the 2005 Service Bulletin. The PI investigator, meanwhile, pressed electrical engineers to continue to look into other possible causes of non-deployment, beyond the low torque problem.

87.     In May 2012, the GM safety attorney asked a GM Vice President (since retired) to act as an "Executive Champion" of the investigation in order to move the matter forward. During the first meeting chaired by the Executive Champion, on May 15, 2012, the GM electrical engineer presented his view that the defective switch was the cause of non-deployment in the affected Cobalt models. Those attendance in included the GM safety attorney, the GM safety director, the PI senior manager, the PI investigator, and others. The Executive Champion encouraged confirmation of this hypothesis through more scientific study.

88.     On May 22, 2012, confirmation was obtained. The GM electrical engineer, the PI investigator, and others traveled again to an auto salvage yard and conducted a thorough study of torque ignition in the switches of several model years of Cobalt, Ion, and other cars. The results confirmed that the majority of vehicles from model years 2003 through 2007 exhibited torque performance below the torque specification that GM had adopted in 2001. They also showed that somewhere starting in model year 2007, the values were within specification.

89.     The observed discrepancy was due to the ignition switch part change that the design engineer had ordered in April 2006. But no one working on the airbag non-deployment investigation in the spring of 2012 knew about that part change, as the part number was the same

23

for the defective switch and the new one. Indeed, when the PI investigator asked the switch engineer in early 2012 to detail any changes that might account discrepancy for the observed at the salvage yard, the design engineer denied knowledge.

90.     Still, the engineers involved knew that studied cars built before 2006 were equipped in with low-torque ignition switches, and that low torque in an ignition could switch result in airbag non-deployment. At this time, no further engineering tests were conducted to explore any other purported root cause of the non-deployment pattern or to the compare 2005 through 2007 model year Cobalt ignition switches with those of later model years.

91.     On June 12, 2012, three weeks after the May 2012 salvage yard expedition, an expert retained by certain plaintiffs in a Virginia crash issued a report. Noting both the 2005 Service Bulletin and the Indiana University study from 2007 that had identified a connection between the defective switch and non-deployment of an airbag in a fatal Cobalt crash, the expert opined that the defective switch was responsible for non-deployment.

92.     At a meeting among GM lawyers in late July 2012 in which the Virginia expert's report was discussed, a newly hired GM attorney asked the group why the Cobalt had not been recalled for the defective switch. Those present explained that the engineers had yet to devise a solution to the problem but that it was being looked into.

93.     The PI investigator, the PI senior manager, the GM safety attorney, the GM safety director, and others met at lengthy intervals through the summer and fall of 2012 and early 2013 to address the issue.  The purpose of the meetings was not to identify the root cause of the problem, but rather to develop the optimal remedy and define the scope of the anticipated recall.

94.     Certain GM personnel wanted to be sure that the fix would be affordable and yet appeal to consumers; that GM would have sufficient parts on hand; and that GM representatives

would be able to fully articulate to NHTSA and the public a "complete root cause" accounting for the discrepancy between the earlier and later vehicle populations.

### h.  Misleading Statements to NHTSA in 2012.

95.    The manner in which the responsible GM personnel were approaching the defective switch and its deadly consequences in 2012 contrasted with the picture the Company was presenting to NHTSA about its recall process.

96.    On October 22, 2012, certain GM personnel met with NHTSA officials in Washington D.C. and gave a description of the Company's recall process intended to assure that safety issues were routinely addressed. The presentation touted a "common global process" with "standard work templates" and explained that the first step toward a potential recall involved investigation by PI of the suspected safety problem. Then, according to the presentation, the matter would be placed promptly into the FPE process, which was controlled not by engineers but by personnel in charge of quality. At this stage, the FPET would consider the logistics of implementing the proposed recall or other contemplated action; the FPERC would recommend the particular field action to be taken; and the EFADC would make a decision. GM gave the impression that its recall process was linear, robust, uniform, and prompt.

97.    While this presentation may have accurately described GM's general recall process and handling of other defects, it did not accurately describe GM's handling of the defective switch (about which NHTSA would remain unaware until 2014). Indeed, several months prior to this presentation, certain GM personnel had identified what they knew to be a dangerous safety defect and had not started it into the first phase of the recall process.

25

### i.   The Defect is Identified But Recall is Delayed.

98.    By early 2013, the defective switch still had not been introduced into the FPE process. GM was exploring optimal remedies and trying to understand why the defect appeared to affect only a limited population of vehicles. Those involved remained unaware of the part change that the design engineer had made back in April 2006—the change that explained why cars built after around late 2006 seemed not to be affected.

99.    Meanwhile, GM lawyers were engaged in litigation related to a crash in Georgia. The plaintiff attorney in that case had learned about the 2005 Service Bulletin, and had developed a theory that the defective switch caused the driver to lose control of her vehicle. The attorney was seeking related discovery from GM, including regarding any design changes to the ignition switch. In that case, GM denied that any such design changes had been made that would affect the amount of torque it takes to move the key from Run to Accessory.

100.    Then, on April 29, 2013, the plaintiff attorney took the deposition of the switch engineer. During that deposition, the plaintiff attorney showed x-ray photographs of the ignition switch from the subject vehicle (the defective switch) and another switch from a later model year Cobalt. The photographs showed that the detent plunger in the early model was much shorter— and therefore would have had much lower torque performance—than the one in the later model year Cobalt. The engineer, confronted with these photographs, continued to deny knowledge of any change to the switch that would have accounted for this difference.

101.    But, as the design engineer later acknowledged, he knew almost immediately following his deposition that there had been a design change to the switch following production of the model year 2005 Cobalt, and that he must have been the engineer responsible for that design change, which was later confirmed by an outside expert retained by GM.

26

102.   GM's counsel in the Georgia crash case lster urged GM to settle: "[T]here is little doubt that a jury here will find that the ignition switch used on [the Georgia crash car] was defective and unreasonably dangerous, and that it did not meet GM's own torque specifications. In addition, the [engineering inquiry documents about the defective switch from 2004 and 2005] and the on-going FPE investigation have enabled plaintiffs' counsel to develop record a from which he can compellingly argue that GM has known about this safety defect from the time the first 2005 Cobalts rolled off the assembly line and essentially has done nothing to correct the problem for the last nine years."  Facing punitive damages, GM agreed to pay $5 million. Notably, on October 7, 2010 and July 26, 2011, GM had previously been warned by outside counsel that it faced punitive damages exposure in other Cobalt airbag non-deployment cases.

103.   Then, in late October 2013, GM received documentary confirmation from the switch supplier that the design engineer had indeed directed a part change in April 2006. This evidence further showed that the part was changed without a change to the corresponding part number. Only at this point did GM finally place the switch matter into the FPE process.

104.   On November 7, 2013, GM personnel met with NHTSA to give a more in-depth presentation targeted at assuring NHTSA that GM was "responsive" and "customer focused" when it came to safety concerns. Although the presentation did not specifically address the switch and non-deployment problem—which has just entered the recall process and remained unknown to NHTSA—it did address concerns related to airbag non-deployment.

105.   First, GM personnel showed NHTSA slides that touted the increasing swiftness with which GM had addressed safety defects from 2008 through 2012. One graph reflected that the average time taken from identification of the issue through recall was 160 days in 2008 and 84 days in 2012. It further showed that the average time an issue remained in the "pre-FPE"

stage was 105 days in 2008 and 33 days in 2012. The average number of days between entry into

the FPE process and the recall was 15 days in 2008 and 13 days in 2012. Other portions of GM's

presentation suggested that any airbag defect that presented with a failure to warn the driver or

certain other aggravating factors would be recalled swiftly.

106.    The defective switch matter entered the ISR on November 5, 2013, after at least

804 days of formal investigation. Although GM told NHTSA that recall would ordinarily occur

about 13 days later, GM would not ultimately decide to conduct a recall for the defective switch

until January 31, 2014. Some within GM expressed concern about how the "timeline" of GM's

response to the problem would look to NHTSA. Indeed, certain GM personnel knew by about

the spring of 2012 that the defective switch posed a serious safety issue because it disabled

airbags in situations when they should have deployed. Yet more than a year and a half after that

discovery, GM still had not conducted a recall.

107.    On January 31, 2014, the voting members of the EFADC agreed that a recall of the

affected cars was warranted. On February 7, 2014, GM announced the recall to the public and

NHTSA. Although other models—the Ion, most notably—were likewise equipped with the

switch, these were not recalled until February 24, 2014.

108.    The Company went on to issue at least 45 recalls in 2014, expanding well beyond the

ignition switch problem to about 28 million vehicles in North America. This number is greater than

the Company's combined U.S. sales for the years 2005-2013. Of total recalls in the U.S. market,

approximately 13 million vehicles involved ignition switch issues. GM reported a $1.2 billion charge

against earnings for the second quarter of 2014 to deal with this problem.

### j. **Summary of Allegations from the DPA.**

109.    As alleged herein, in September 2015, GM entered into the DPA with the U.S.

Department of Justice in connection with the ignition switch defect and its consequences. In

connection with the public announcement of the DPA, the government released the following release

summarizing the facts to which GM had <u>admitted</u>:

<u>Early Knowledge of the Defective Switch</u>

GM engineers knew before the defective switch even went into production in 2002 that it was prone to easy movement out of the Run position.  Testing of a prototype showed that the torque return between the Run and Accessory positions fell below GM's own internal specifications.  But the engineer in charge of the defective switch approved its production anyway.

In 2004 and 2005, as GM employees, media representatives and GM customers began to experience sudden stalls and engine shutoffs caused by the defective switch, GM considered fixing the problem.  However, having decided that the switch did not pose a safety concern, and citing cost and other factors, engineers responsible for decision-making on the issue opted to leave the defective switch as it was and simply promulgate an advisory to dealerships with tips on how to minimize the risk of unexpected movement out of the Run position.  GM even rejected a simple improvement to the head of the key that would have significantly reduced unexpected shutoffs at a price of less than a dollar a car.

At the same time, in June 2005, GM made public statements that, while acknowledging the existence of the defective switch, gave assurance that the defect did not pose a safety concern.

*GM's Knowledge that the Defective Switch Causes Airbag Non-Deployment*

By the spring of 2012, GM knew that the defective switch presented a safety defect because it could cause airbag non-deployment in certain GM cars.  Specifically, GM personnel investigating the cause of a series of airbag non-deployment incidents learned that the defective switch could cause frontal airbag non-deployment in at least some model years of the Cobalt, and were aware of several fatal incidents and serious injuries that occurred as a result of accidents in which the defective switch may have caused or contributed to airbag non-deployment.  This knowledge extended well above the ranks of investigating engineers to certain supervisors and attorneys at the company.

*GM's Failure to Disclose the Defect and Recall Affected Cars*

Yet not until approximately 20 months later, in February 2014, did GM first notify NHTSA and the public of the connection it had identified between the defective switch and airbag non-deployment incidents.  The company thus egregiously disregarded NHTSA's five-day regulatory reporting requirement for safety defects.

Moreover, for much of the period during which GM failed to disclose this safety defect, it not only failed to correct its June 2005 assurance that the defective switch posed no safety concern but also actively touted the reliability and safety of cars equipped with the defective switch, with a view to promoting sales of used GM cars.  Although GM sold no new cars equipped with the defective switch during this period, GM dealers were still, from in or about the spring of 2012 through in or about the spring of 2013, selling pre-owned Chevrolet, Pontiac and Saturn brand cars that would later become subject to the February 2014 recalls.  These sales were accompanied by certifications from GM, assuring the unwitting consumers that the vehicles' components, including their ignition systems and keys, met all safety standards.

GM's delay in disclosing the defect at issue was the product of actions by certain personnel responsible for shepherding safety defects through GM's internal recall process, who delayed the recall until GM could fully package, present, explain and handle the deadly problem.  Rather than move swiftly and efficiently toward recall of at least the population of cars known to be affected by the safety defect and thus certainly destined for recall, GM personnel took affirmative steps to keep the company's internal investigation into airbag non-deployment caused by the defective switch "offline" – outside of GM's regular recall process.

Moreover, on at least two occasions while the defective switch condition was well known by some within GM but not disclosed to the public or NHTSA, GM personnel made incomplete and therefore misleading presentations to NHTSA assuring the regulator that GM would and did act promptly, effectively and in accordance with its formal recall policy to respond to safety problems – including airbag-related safety defects.

**III.    GM Admits Internal Control Failures and Fires Senior Personnel.**

110.   GM's admissions in February 2014 prompted a series of Congressional and private investigations into what went wrong at the Company. In April 1, 2014 testimony before the U.S. House Committee on Energy and Commerce, defendant Barra admitted on behalf of GM that moving shutdowns at highway speeds are indeed a safety issue. She also admitted that, for years, GM had been focused on containing and managing costs rather than safety or quality.

30

111.   According to Barra, "there were points in time where one part of the organization had information that wasn't shared across to the other side of the organization. You can call it a silo . . . . we've already made changes to the structure and to the responsibilities of people so that won't happen again." She further admitted that GM testified that "we in the past had more of a cost culture and we are going to a customer culture that focuses on safety and quality."

112.   Following the February 2014 recall, NHTSA conducted an investigation into GM's handling of the ignition switch defect, which resulted in GM signing a Consent Order with NHTSA on May 16, 2014. NHTSA's investigation concluded that GM engineers, lawyers, investigators, and senior management responsible for reporting safety issues knew about the defect and its connection to airbag non-deployment for a long time prior to GM's decision to conduct the ignition switch recalls. In the Consent Order, GM "admit[ted] that it violated the Safety Act" and agreed to "pay the United States a maximum civil penalty" of $35 million for those violations.

113.   Soon top engineering officials began to leave GM. On April 22, 2014, defendant Calabrese, GM's Global Engineering Chief, who had been with GM for more than 33 years and had been Vice President of Global Vehicle Engineering since April 2011, "elected to retire" as part of GM's restructuring in order to "address functional safety and compliance of its vehicles." On May 5, 2014, 56-year-old Jim Federico, GM's Chief Engineer of Global Company Cars, announced his sudden retirement from GM. Federico had been with GM for nearly 36 years

114.   In a May 16, 2014 press release issued in connection with the NHTSA Consent Order, the NHTSA Acting Administrator summarized NHTSA's findings, stating that "the evidence we found behind [GM's failure to report in a timely manner] was deeply disturbing," and concluding, *inter alia*, that GM had known about the ignition switch defect "for many years," and that "senior management received detailed briefings about this safety-related defect."

31

115.    In the Consent Order with NHTSA, GM also admitted to numerous internal control failures, including inadequacies in its processes for identifying safety defects and reporting those defects to NHTSA, and its processes for assessing the number of warranty claims relating to safety defects. GM further identified its failure to "conduct a safety recall because GM had not yet identified the precise cause of the defect" as yet another internal control failure.

116.    In particular, in the Consent Order GM admitted to serious inadequacies in its internal controls, including:

- GM's "ability to analyze data to identify potential safety-related defects" was inadequate;

- GM had failed to "encourag[e]" and needed to "improv[e] information sharing across functional areas and disciplines";

- GM's recall decision-making process was inadequate, necessitating the need for GM to "increas[e] the speed with which recall decisions are made (including by clarifying the recall decision-making process to decrease the number of steps prior to making the final decision of whether to conduct a recall)";

- GM had failed to adequately communicate "with NHTSA regarding actual or potential safety-related defects"; and

- GM's "ability to identify safety consequences and the severity of those consequences, as well as to assess the number or rate of allegations, complaints, incidents, reports and/or warranty claims relating to potential safety-related defects" was "inadequate."

117.    The Valukas Report commissioned by the Board likewise addressed GM's failed internal controls regarding the ignition switch defect. According to the Valukas Report, "there were no timetables, no meetings scheduled, and no progress." Rather, the "phenomenon of avoiding responsibility" was so institutionalized at GM that employees knew it as "the 'GM salute,'" described

32

as "a crossing of the arms and pointing outward towards others, indicating that the responsibility belongs to someone else, not me." As the NHTSA Acting Administrator had remarked, "GM's decision-making, structure, process and corporate culture stood in the way of safety."

118.    The Valukas Report also noted the extensive history of accident litigation involving affected vehicles, including the risk of punitive damages. It stated that "the story of the Cobalt is one in which GM personnel failed to raise significant issues to key decision-makers. Senior attorneys did not elevate the issue within the legal chain of command to the General Counsel even after receiving [an] evaluation in the summer of 2013 that warned of the risk of punitive damages."

119.    On June 5, 2014, defendant Barra admitted that "we made serious mistakes in the past and as a result we're making significant changes in our company to ensure they never happen again." During a "town hall" meeting on June 5, 2014, defendant Barra stated that "We are going to fix the failures in our system." On June 6, 2014, the Chairman of GM's Board, Theodore Solso, stated that "The Board, like management, is committed to changing the company's culture and processes to ensure that the problems described in the Valukas report never happen again."

120.    During defendant Barra's testimony before the U.S. House Committee of Energy and Commerce on June 18, 2014, Senator Ron Johnson questioned whether problems arising from the ignition switch defect were included in risk and compliance shareholder disclosure reports mandated by the SEC, asking Barra "How does it break down that bad in a company that is, you know, publicly traded?" Barra admitted that "it is unacceptable the way things broke down, and that is why we have made dramatic process changes." Barra further admitted that the Valukas Report "paints a picture of an organization that failed to handle a complex safety issue in a responsible way . . . There is no way to minimize the seriousness of what Mr. Valukas and his investigations uncovered." Barra further admitted that "deep underlying cultural problems [were] uncovered in this report."

33

121.   On July 17, 2014, during a hearing before the U.S. Senate Consumer Protection Subcommittee in which the Valukas Report was discussed, defendant Barra conceded that "I will use the report's findings and recommendations to attack and remove information silos wherever we find them and to create an organization that is accountable and focused on the customer."

122.   GM subsequently fired or terminated a large group of employees, including, legal, safety and investigative personnel. On July 17, 2014, defendant Barra stated: "We removed fifteen employees from the company… some for misconduct or incompetence, others because they didn't take responsibility or act with a sense of urgency." Barra told reporters that most of the individuals were in "senior or executive roles" and "reached the highest levels of the company."

123.   It was reported that the terminated individuals included Ray DeGiorgio, the design engineer; Gary Altman, Chief Development Engineer; Ron Porter and Jaclyn Palmer, product litigation attorneys; Jennifer Sevigny, an attorney who led GM's field product assessment group; William Kemp, Counsel for Global Engineering Organization, GM's top safety lawyer; Lawrence Buonomo, Practice Area Manager, Global Process & Litigation; Michael Robinson, Vice President of Sustainability and Global Regulatory Affairs and the former North American general counsel; Gay Kent, General Director of Safety and Vehicle Crashworthiness; Carmen Benavides, Director of Product Investigations; and Maureen Foley- Gardener, Director of Field Performance.

124.   GM's profuse admissions and apologies continued unabated in 2014. Defendant Akerson admitted on July 28, 2014 that "I think we all – including the new and the old part of the management team – didn't fully realize how deep some of the problems ran." Remarkably, on September 8, 2014, GM's Chairman Theodore Solso admitted that "Yes, we should have known earlier. The way I look at it, **G.M. has not been well run for a long time**."

125.   On October 1, 2014 during a conference call with investors, defendant Barra further

admitted that the Company controls were defective, stating: "[W]hen I think about how do I start changing a culture, creating the ultimate culture that we want, it starts today with the behaviors that we demonstrate. And we've been very clear with our leadership team and as we've rolled out the core values to every employee, **that we need to change behaviors, and that includes me**."

126.    A GM spokesperson also admitted on November 11, 2014, that "our system needed reform, and we have done so. We have reorganized our entire safety investigation and decision process." CFO Tom Ammann admitted on November 11, 2014 that "It [the ignition switch recall] reinforced the need for ongoing change. We needed to break down our internal silos, integrate and require transparency across the business so that everyone is sharing information."

127.    Finally, defendant Barra admitted on January 8, 2015 concerning GM's internal controls and the ignition switch recalls that "It was clearly a tragedy, and it was deeply troubling. But we quickly acknowledged our shortcomings and set about addressing them."

## IV.    The Individual Defendants Breached Their Fiduciary Duties.

### a. Barra

128.    During relevant times, Barra served in three senior officer positions with GM: Senior Vice President, Global Product Development; Executive Vice President, Global Product Development, Purchasing & Supply Chain; and CEO. As alleged herein, in the first two positions Barra was identified as GM's "Product Chief" and in that role Barra was responsible for the design, engineering, program management and quality of GM vehicles around the world.

129.    To discharge her duties as an officer in these senior positions, Barra was required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of GM's business affairs. By virtue of such duties, Barra was required to, among other things: establish corporate governance and reporting structures effective to inform herself about the occurrence of

safety-related product defects; conduct the affairs of GM in an efficient manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and remain informed as to how GM conducted its operations, and, upon receipt of notice of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take proactive steps to correct such conditions or practices.

130.    While GM has acted against employees allegedly responsible for events related to the ignition switch defect and recall, defendant Barra largely escaped scrutiny and was even promoted to CEO, even though she received early emails regarding GM recalls raising technical issues very similar to those plaguing vehicles equipped with the defective switches.

131.    On October 3, 2011, after Barra had become Senior Vice President for Global Product Development, the then-Vice President for Global Quality sent her an email with a press report disclosing that NHTSA was investigating Saturns for power steering problems.

132.    This email informed Barra that "the National Highway Traffic Safety Administration is a step closer to concluding that General Motors should have recalled 384,000 Saturn Ions in 2010 as part of a larger recall that covered one million Chevrolets and Pontiacs for a steering problem. The agency posted a document on its Web site over the weekend at the time saying that it upgraded its investigation into Saturn Ions from the 2004-7 model years as a result of heightened concern that a sudden loss of electric power steering could cause crashes. The document shows the agency has 846 complaints from Saturn owners and G.M. has almost 3,500." [emphasis supplied].

133.    In addition, on April 22, 2012, Barra received an email from a former GM employee reporting the existence of the "moving stall" with a Buick directly attributable to key design and suggesting that the Company investigate and perhaps issue a service bulletin. Barra forwarded the e-

mail to the VP for Global Quality. Her email was then forwarded to others within GM and an e-mail discussion ensued ultimately involving eight people, but no longer including Barra.

134.    The Valukas Report further notes that in December 2013, Barra was provided with information that data was being reviewed that could lead to a recall in connection with the defective ignition switch. The recall was not announced until February 7, 2014, a substantial delay which formed a basis for NHTSA's determination that GM failed to timely report the safety defect.

135.    Furthermore, as *The New York Times* reported on November 10, 2014, GM placed an urgent order with Delphi for 500,000 replacement switches on December 18, 2013. Specifically, on December 18, 2013, almost two months before GM first publicly announced in February 2014 that it was recalling Cobalts and Pontiac G5s due to the defective ignition switches, GM internally placed an "urgent" parts order with its ignition switch supplier, Delphi, for 500,000 ignition switches that would be used as the replacements in the eventual recalls. At this time, Barra was still serving as Executive Vice President, Global Product Development, Purchasing & Supply Chain.

136.    Notwithstanding these matters which provided actual or constructive notice to defendant Barra, she failed to act responsibly. In this regard, Barra stated once the ignition switch problems *were* finally revealed "that we need to change behaviors, ***and that includes me***."

137.    As alleged herein, defendant Barra was sued for securities fraud in the Securities Class Action, in which the plaintiffs alleged that certain GM defendants, including Barra, made false and misleading statements to purchasers of GM stock, with intent to defraud them. GM settled these claims for $300 million rather than even await a decision on its pending motion to dismiss.

138.    As alleged herein, on January 31, 2014, the EFADC officially determined to issue the first recall. Barra has admitted that she knew of the ignition switch defect by this date. These facts support a strong inference that Barra knew about GM's decision to conduct the ignition switch recall

by January 31, 2014, yet just days later her internal controls certification included with GM's Form 10-K filing for 2013 was filed with the SEC.

139.    As "Product Chief" and then CEO of GM, defendant Barra knew that the Company's internal controls regarding safety and regulatory compliance were critical to GM's continuing operations as a car manufacturer. As such, Barra knew or recklessly failed to learn that GM lacked sufficient internal controls to ensure that product defects raising consumer safety issues would be (a) elevated to senior management so that prompt action could be taken; and (b) properly communicated to GM's regulators to ensure consumer safety and legal compliance. Nevertheless, Barra knowingly, recklessly or with gross negligence failed to timely remediate these failing internal controls.

### b. Akerson

140.    During relevant times, Akerson was CEO of GM. By reason of his position as an officer of GM, Akerson owed GM and its shareholders fiduciary duties of care and loyalty in the management and administration of GM's affairs, as well as in the use and preservation of GM's property and assets. To discharge his duties, Akerson was required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of GM's business affairs.

141.    Akerson was required to, among other things: monitor and oversee a system of internal controls sufficient to ensure that GM's products were safe; ensure that the Company timely and accurately informed customers and regulators regarding safety problems; establish corporate governance and reporting structures effective to inform himself about the occurrence of safety-related product defects; conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; remain informed as to how GM conducted its operations; and, upon

receipt of notice of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith and take proactive steps to correct such conditions or practices.

142.    Defendant Akerson was the CEO of GM from 2010 through late 2013. Akerson abruptly left GM in December of 2013. Once the ignition switch scandal was revealed in February 2014, Akerson admitted that GM's internal controls, for which he had been responsible as CEO, were ineffective during his tenure. As reported by *The Detroit News* on July 28, 2014, Akerson admitted "I think we all – including the new and the old part of the management team – ***didn't fully realize how deep some of the problems ran***." These systemic failures were directly Akerson's responsibility as CEO. Furthermore, Akerson's stark admission contradicts his repeated certifications in SEC filings that GM's internal controls were adequate when they were not.

143.    In this regard, the suspicious timing of Akerson's "retirement" from GM in late 2013, shortly before the recalls began, and his stated intent to spend time with his family (even while taking on the position of Vice Chairman of The Carlyle Group, a large asset management firm) raise serious questions regarding whether Akerson fulfilled his fiduciary duties as CEO.

144.    For example, on April 8, 2014, *Forbes* reported that John McElroy, an authority on the automotive industry, asked whether Akerson's abrupt departure indicated that he knew by late 2013 "about the coming cataclysmic recall." McElroy asked: "So [Akerson] doesn't have time to be chairman of General Motors, but he does have time to be vice chairman of Carlyle?" Akerson also joined Lockheed Martin as a director in early 2014, less than two months after leaving GM.

145.    Defendant Akerson's departure from the Company also coincided perfectly with GM's unusual "urgent" parts order with its ignition switch supplier, Delphi, for 500,000 ignition switches that would be used as the replacements in the eventual recalls.

146.    In addition, as alleged herein, defendant Akerson was sued for securities fraud in the

Securities Class Action, in which the plaintiffs allege that certain GM defendants, including Akerson, made false and misleading statements to purchasers of GM stock, with intent to defraud them. GM settled these claims for $300 million rather than await a decision on its pending motion to dismiss.

147.    As CEO of GM, defendant Akerson knew that the Company's internal controls regarding safety and regulatory compliance were critical to GM's continuing operations as a car manufacturer. As such, Akerson knew or recklessly failed to learn that GM lacked sufficient internal controls to ensure that product defects raising consumer safety issues would be (a) elevated to senior management so that prompt action could be taken; and (b) properly communicated to GM's regulators to ensure consumer safety and legal compliance. Akerson knowingly, recklessly or with gross negligence failed to timely remediate these internal controls.

### c. Millikin

148.    During relevant times, Millikin served as a Senior Vice President and General Counsel of GM. To discharge his duties as an officer, Millikin was required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of GM's business affairs.

149.    By virtue of such duties, Millikin was required to, among other things: ensure that the Company timely and accurately informed customers and regulators regarding safety problems; establish corporate governance and reporting structures effective to inform himself about the occurrence of safety-related product defects; conduct the affairs of GM in an efficient manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and remain informed as to how GM conducted its operations, and, upon receipt of notice of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take proactive steps to correct such conditions or practices.

150.    Defendant Millikin became General Counsel of the Company in 2009. On October 17, 2014, GM announced that defendant Millikin had informed the Company of his decision to retire in early 2015 after more than 40 years at GM. As alleged herein, Millikin has admitted that the legal department of GM, for which he was directly responsible, failed to work properly.

151.    At GM, Millikin headed a legal department consisting of a team of attorneys, including those who assisted in the defense of personal injury litigation. As alleged herein, by virtue of such litigation, several attorneys were put on notice of the role of the ignition switch defect in vehicle crashes, but failed to elevate the issue. During a July 17, 2014 Senate hearing, defendant Millikin admitted that **"We had lawyers at GM who didn't do their jobs; didn't do what was expected of them."** According to defendant Millikin, "those lawyers are no longer with the company" and "[a]s general counsel, **I am ultimately responsible for the legal affairs of the company**."

152.    During the July 17, 2014 hearing, Senator Richard Blumenthal stated that "In this instance, the lawyers enabled purposeful concealment and cover-up, possible criminal action that is the subject right now of an investigation."

153.    As alleged herein, the legal department had been on notice for years of serious accidents and related personal injury litigation which could be traced to stalled vehicles. As Senator McCaskill put it: "the failure of this legal department is stunning." A *Forbes* article dated July 20, 2014 and entitled "Barra is protecting GM Top Lawyer – But Should She Be?" reported:

> GM's earlier report on its internal investigation said that members of Millikin's staff were warned repeatedly starting in 2010 that GM could face big punitive-damage awards over its failure to address the defect adequately, but it said that the amounts of the settlements involved were too low to require Millikin's review.

> But Sen. Claire McCaskill (D., Mo.) was among panel members who were incredulous that Millikin wasn't blamed anyway. "How in the world, in the aftermath of this report, did Michael Millikin keep his job?" she asked. "This is either gross negligence or gross incompetence on the part of the lawyer, the notion that he can say, 'I didn't know.'"

41

And Sen. Dean Heller (R., Nev.) told the Wall Street Journal: "I was surprised at the bear hug that [Barra] gave Millikin in that hearing. Even if he didn't know, he had an obligation to know.

154. Indeed, the Valukas Report confirms that GM's lawyers did not have a uniform policy in place for elevating safety issues in connection with the aforementioned "Roundtable" process:

> The main function of the Roundtable was to generate better claim evaluations and settlement forecasts through a "peer review" structure. But a number of GM lawyers reported that it had a second function as well: to spot trends indicating safety issues. Product litigation attorney Ron Porter stated that it was well recognized that a goal of the Roundtable and SRC process was to identify potential safety issues and refer them to engineers. His product litigation colleague Jaclyn Palmer said that attorneys discussed potential product safety or accident trends at Roundtables on occasion, and the Roundtable Committee referred issues to GM engineers for a follow-up investigation. Not all GM lawyers, however, agreed with this view. Buonomo, for example, said that it was not the Roundtable's function to spot trends and that if a lawyer had to flag a trend, then the system had already failed. To put this issue in a specific context, at a Roundtable discussion on the Cobalt airbag non-deployment issue in 2012, a junior lawyer recalled asking whether there should be a recall. He was told that the issue had already been raised with engineering, that the engineers were working on it, and that they had not come up with a solution. This lawyer got the "vibe" that the lawyers had "done everything we can do." **We have discovered no formal written policies governing how the settlement committees should handle safety issues**. [emphasis supplied].

155. These "formal written policies" were the responsibility of Millikin. Millikin's legal department was put on notice of injuries and even deaths related to the ignition switch failure as early as 2010, yet Millikin failed to ensure that matters of such a serious nature would be brought to his attention as the General Counsel, or to the attention of senior management.

156. Indeed, according to the Valukas Report, "senior attorneys did not elevate the issue within the Legal chain of command to the General Counsel - even after receiving the evaluation in the summer of 2013 that warned of the risk of punitive damages because of a 'compelling[]' argument that GM had 'essentially done nothing to correct the problem for the last nine years.'"

157. Furthermore, according to the Valukas Report, GM employees were instructed to write

"smart" and not to use "judgmental adjectives and speculation" regarding issues which might help a

plaintiff lawyer's case. Furthermore, according to the Valukas Report:

> In addition to being trained on how to write, a number of GM employees reported
> that they did not take notes at all at critical safety meetings because they believed
> GM lawyers did not want such notes taken. No witness was able to identify a
> lawyer who gave such an instruction, no lawyer reported having given such an
> instruction, and we have found no documents or emails reflecting such an
> instruction. The no-notes direction, however, reached the status of an urban myth
> that was followed, an instruction passed from GM employee to GM employee
> over the years. Thus, as we learned in our investigation, for many meetings – of
> GM's many committees - there are no clear records of attendance or of what was
> discussed or decided.

158.   While Millikin was permitted to "retire" from GM in 2015, up to five GM attorneys on

his staff were terminated.

159.   As General Counsel of GM, defendant Millikin knew that the Company's internal

controls regarding legal, safety and regulatory compliance were critical to GM's continuing operations

as a car manufacturer. As such, Millikin knew or recklessly failed to learn that GM lacked sufficient

internal controls to ensure that product defects raising consumer safety issues would be (a) elevated to

senior management so that prompt action could be taken; and (b) properly communicated to GM's

regulators to ensure consumer safety and legal compliance. Millikin knowingly, recklessly or with

gross negligence failed to timely remediate these internal controls.

### d. Calabrese

160.   During relevant times, Calabrese was Vice President Global Vehicle Engineering,

identified in the Valukas Report as GM's "Chief Engineer." By reason of his position as an officer of

GM, Calabrese owed GM and its shareholders fiduciary duties of care and loyalty in the management

and administration of GM's affairs, as well as in the use and preservation of GM's property and assets.

161.   By virtue of such duties, Calabrese was required to, among other things: establish

corporate governance and reporting structures effective to inform himself about the occurrence of

safety-related product defects; conduct the affairs of GM in an efficient manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; to remain informed as to how GM conducted its operations; and, upon receipt of notice of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith and take proactive steps to correct such conditions or practices.

162.     Calabrese's retirement from GM in 2014 was announced as part of GM's restructuring to "address functional safety and compliance of its vehicles."

163.     Calabrese knew about the ignition switch defect well before the February 2014 recall. In early 2013, Calabrese was asked to appoint a replacement "Executive Champion" for the ongoing ignition switch investigation, which, according to the DPA, had already established a connection between the ignition switch and airbag non-deployment in the Cobalt.

164.     Calabrese was on notice of GM's failing safety and recall practices. On July 23, 2013, Frank Borris from NHTSA's Office of Defects Investigation sent an email to Carmen Benavides, GM Director of Product Investigations, Safety Regulations, Field Performance Assessment, and TREAD, about an upcoming July 25, 2013 meeting between GM and NHTSA. Borris provided Benavides with a list of issues he wished to discuss with GM concerning GM's delays to take action on safety issues, and wrote that "[t]he general perception is that GM is slow to communicate, slow to act, and, at times, requires additional effort of ODI that we do not feel is necessary with some of your peers." Borris added that "there is a general perception in ODI that GM is one of, if not the worst offender of the regional recall policy." Benvenides immediately forwarded this email to Calabrese.

165.     Furthermore, according to the Valukas Report, Calabrese was part of the EFADC (the committee at GM responsible for approving recalls) in late 2013 that did not vote to recall affected

vehicles until January 31, 2014, even after it had already learned that the defect had caused fatalities.

166.    According to the Valukas Report:

When asked why he did not support an immediate recall given the fact that
fatalities had occurred, Calabrese explained that, at this point, he did not see a
reason to rush to a recall because the backup slides to the EFADC materials
showed a strong downward trend in the occurrence of airbag non-deployments
and he wanted the investigation to be done correctly so that the solution arrived at
would actually fix the problem.

167.    Notably, GM identified its failure to "conduct a safety recall because GM had not yet

identified the precise cause of the defect" as an internal control failure in the NHTSA Consent Order.

168.    As an officer and the Chief Engineer of GM, defendant Calabrese knew about the

ignition switch but failed to immediately inform his superiors, in breach of his fiduciary duties.

169.    In addition, Calabrese knew that the Company's internal controls regarding safety

defect detection and disclosure were critical to GM's continuing operations as a car manufacturer. As

such, Calabrese knew or should have known that GM lacked sufficient internal controls to ensure that

product defects were (a) elevated to senior management so that prompt action could be taken; and (b)

properly communicated to GM's regulators to ensure consumer safety and compliance. Calabrese

knowingly, recklessly or with gross negligence failed to timely remediate these internal controls.

### V.    False Statements to Shareholders from 2011 through 2014.

170.    In light of the problems with the ignition switch and the internal control breakdown

alleged herein, it is apparent that multiple GM SEC filings between 2011 and 2014 contained false

and misleading statements, as alleged in the Securities Class Action.

171.    In this regard, the Company's SEC filings from 2011 and 2014 were false and

misleading because the costs of GM's product warranty and recall campaigns for defective vehicles,

as well as the costs of claims against the Company that GM incurred, or reasonably expected to incur,

as a result of the Company's manufacture and sale of the defective vehicles (including those costs eventually paid for once the ignition switch defect was fully exposed) were materially understated.

172.    As a result of GM not issuing any safety recall during this period, GM understated, and failed to disclose, the Company's true liabilities, costs and contingencies because GM knew or recklessly disregarded that safety problems existed in connection with the ignition switch.

173.    In addition, the Company's SEC filings during this period were false and misleading to the extent they represented that the Company was committed to safety, a common refrain throughout the Company's public filings from 2011 through 2014, as alleged herein. As alleged herein, GM admitted that, during this time, it was more focused on cost containment, not safety.

174.    Akerson signed GM's Forms 10-K for the years ended December 31, 2010; December 31, 2011; and December 31, 2012; GM's Annual Reports dated March 1, 2011, February 27, 2012, and April 25, 2013; and certifications in GM's Forms 10-K and 10-Q filed with the SEC on March 1, 2011, May 6, 2011, August 5, 2011, November 9, 2011, February 27, 2012, May 3, 2012, August 3, 2012, October 31, 2012, February 15, 2013, May 2, 2013, July 25, 2013 and October 30, 2013.

175.    Barra signed GM's Form 10-K for the year ended December 31, 2013, along with the certification attesting to the Company's internal controls in GM's Form 10-K filed with the SEC on February 6, 2014. Remarkably, while Barra attested to the adequacy of the internal controls, just one day after the Form 10-K was filed GM's internal control failures became apparent with the recall.

## DERIVATIVE AND DEMAND REFUSAL ALLEGATIONS

176.    Plaintiff brings this action on behalf of GM to redress injuries suffered, and to be suffered, by GM as a direct result of violations of the breaches of fiduciary duty alleged herein. GM is named as a nominal defendant solely in a derivative capacity.

177.    Plaintiff will adequately and fairly represent the interests of GM in enforcing and

prosecuting its rights and have hired counsel experienced in shareholder litigation. Plaintiff was a shareholder of GM at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current GM shareholder.

178.   By letter dated April 30, 2015 plaintiff made a demand on the Board to investigate and pursue legal remedies against all wrongdoers with responsibility for the ignition switch disaster and the related fallout. By letter dated June 24, 2015, GM's in-house counsel advised that the Board had determined to defer consideration of the demand "until the Court rule[d]" on a pending motion to dismiss in the factually similar action *In re General Motors Derivative Litigation*, No. C.A.9627-VCG, pending in the Delaware Chancery Court. In that case, the plaintiffs alleged that a shareholder demand like the one made by plaintiff in this action was excused for futility.

179.   By order dated June 26, 2015, the Delaware Chancery Court granted the motion to dismiss, and held that demand futility had not been alleged with sufficient particularity, such that demand was not excused. At this time, the Board became obligated to act immediately on plaintiff's demand. Plaintiff therefore wrote to the Board on July 27, 2015 demanding immediate action.

180.   However, by letter to plaintiff dated September 15, 2015, the Board reversed course, stating that it would *again* defer consideration of the demand, because the Delaware plaintiffs had filed an appeal and the Board would await "disposition" of the appeal before taking any action. That appeal remains pending. Meanwhile, as alleged herein, GM continues to incur billions of dollars in penalties, settlements, and exposure due to the egregious wrongdoing of the defendants.

181.   It is apparent that Board is motivated by delay and obstruction. For the reasons alleged herein, in light of the scope of the ignition switch episode, the Board's conduct is unreasonable and in bad faith, and its refusal of the demand is not protected by the business judgment rule. Notwithstanding the severity of the ignition switch scandal, which has resulted in billions of dollars in

liabilities, the departure of substantial number of senior management personnel, a raft of private consumer and injury litigation, and a DPA after a criminal investigation, to plaintiff's knowledge the Board has failed to even convene a committee to consider the demand.

182.    The Board's rejection of plaintiffs' demand was wrongful. In particular, the Board's letters to plaintiff confirm that it: (a) failed to promptly hire independent counsel to actually *investigate* possible claims before deciding to put off consideration of them indefinitely; (b) failed to commission or produce a written report detailing any process, reasoning and/or conclusions; and (c) failed to document any evaluation of claims, defenses and remedies. Not surprisingly, based on this hopelessly flawed process, the Board concluded that it would do nothing indefinitely.

183.    In sum, nothing in the record indicates a reasonable or good faith attempt by the Board to actually evaluate the demand, or to consider the existence of meritorious claims for non-exculpable breaches by at least some of the officers, even as GM agreed to pay $300 million to settle allegations of fraud against some of these same individuals, in addition to a $900 million criminal forfeiture and hundreds of millions of dollars more in injury settlements. Taken together with the Board's failure to convene a proper committee, conduct a reasonable investigation, or create a report documenting its conclusions, the Board's response to plaintiff's demand cannot be deemed a valid exercise of business judgment entitled to any presumption of reasonableness and good faith.

184.    Under these circumstances, plaintiff must act to prosecute the Company's claims.

## COUNT I

## BREACH OF FIDUCIARY DUTY

## (Against the Individual Defendants)

185.    Plaintiff incorporates by reference the allegations set forth above.

186.    Each of the Individual Defendants was an officer of GM during relevant times, and as

such owed to the Company fiduciary obligations. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision in connection with the rampant violations at GM in connection with the ignition switch defect. The Individual Defendants acted intentionally, recklessly, and/or with gross negligence.

187.    Furthermore, the Individual Defendants failed to disclose, or caused the Company to fail to disclose, material information and/or made material misstatements to shareholders regarding the Company's business, financial condition, and revenue recognition. These Individual Defendants either knew, or recklessly or with gross negligence disregarded, that the statements alleged herein about GM's business, its financial condition, and revenue were false and misleading when made.

188.    The Individual Defendants ignored obvious and pervasive problems with GM's internal controls and safety procedures alleged herein, and by deliberate, reckless and/or grossly negligent indifference failed to make a good faith effort to correct the problems until it was far too late.

189.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, GM has sustained significant damages, not only monetarily as alleged herein, but also to its corporate reputation and goodwill.

190.    As a result of the misconduct alleged herein, defendants are liable to GM.

## COUNT II

## CONTRIBUTION AND INDEMNIFICATION

### (Against the Individual Defendants)

191.    Plaintiff incorporates by reference the allegations set forth above.

192.    GM is liable to private and public persons, entities, and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to the Individual Defendants' liability to GM.

193.    GM's alleged liability on account of the wrongful acts and practices and related

49

misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or grossly negligent acts or omissions of the Individual Defendants.

194.   GM is entitled to contribution and indemnification from each of the Individual Defendants in connection with all such claims that have been, are, or may in the future be asserted against GM by virtue of the Individual Defendants' wrongdoing.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of GM, demands judgment as follows:

A.    Determining that this suit is a proper derivative action and certifying plaintiff as an appropriate representative of GM for said action;

B.    Declaring that the Individual Defendants have violated their fiduciary duties to GM and its shareholders;

C.    Awarding GM the damages sustained by GM as a result of the Individual Defendants' breaches of fiduciary duties, in an amount to be determined at trial, together with pre-judgment and post-judgment interest;

D.    Equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including (a) the institution of appropriate corporate governance reforms and internal control improvements to remediate and prevent the recurrence of the misconduct alleged herein, and (b) attaching, impounding, imposing a constructive trust on, or otherwise restricting the Individual Defendants' assets so as to assure that plaintiff has an effective remedy;

E.    Awarding plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 10, 2016

/s/ Andrew J. Morganti
Andrew J. Morganti
**MORGANTI LEGAL**
535 Griswold Street, Suite 111-181
Detroit, MI 48226
(248) 787-6078
(416) 800-2171 (Fax)
amorganti@morgantilegal.com
Mich. Bar No. P57989

*Local Counsel for Plaintiff*

**SCHUBERT JONCKHEER & KOLBE LLP**
Robert C. Schubert
Willem F. Jonckheer
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220
(415) 788-0161 (Fax)
rschubert@schubertlawfirm.com
wjonckheer@schubertlawfirm.com

*Counsel for Plaintiff*