# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DANIEL J. CARRO,

                Plaintiff,

    v.

MARY T. BARRA, DANIEL F.
AKERSON, MICHAEL P. MILLIKIN,
AND JOHN CALABRESE,

              Defendants,

  -and-

GENERAL MOTORS COMPANY,

           Nominal Defendant.

**No. 2:16-cv-10479-RHC-MKM**

**Judge Robert H. Cleland**

**Magistrate Judge
Mona K. Majzoub**

**VERIFIED AMENDED
SHAREHOLDER
DERIVATIVE COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff Daniel J. Carro, by his undersigned attorneys, for his verified amended

shareholder derivative complaint, alleges upon information and belief, except as to

allegations about himself, which are based upon personal knowledge, as follows, upon

the investigation of counsel. This investigation included the review of information

relating to the relevant time period obtained from public and proprietary sources –

including, *inter alia*, United States Securities and Exchange Commission ("SEC")

filings, court filings in civil, regulatory and criminal proceedings, internal corporate

documents obtained by plaintiff pursuant to Delaware law, public reports, press releases, news articles and other media reports. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF ACTION

1.     This is a shareholder derivative action on behalf of nominal defendant General Motors Company ("GM" or "the Company") against certain of its current and former officers. This case seeks to remedy the defendants' breaches of fiduciary duties arising out of the now infamous ignition switch disaster which has cost GM billions of dollars and counting.

2.     As alleged herein, beginning in or around 2002, GM sold millions of cars to unsuspecting consumers with a dangerous ignition switch safety defect that caused the vehicles to suddenly shut down without warning while also disabling the airbags, including at highway speeds. While red flags about the defect were evident at GM as early as 2003-2004, GM's management, including the defendants herein, failed to timely detect the problem, failed to ensure that the problem was appropriately addressed, ignored the implications of the defect as the evidence mounted that a serious safety problem was at hand, and affirmatively misled regulators, the public and the Company's shareholders even once the scope of the problem was fully known inside GM.

3.      In the wake of the ignition switch revelations in early 2014, GM retained
Anton R. Valukas ("Valukas"), a partner at Jenner & Block, to conduct what was
described as an unvarnished investigation of the facts and circumstances surrounding
the ignition switch defect. In a report dated May 29, 2014 entitled Report to the Board
of Directors of General Motors Company Regarding Ignition Switch Recalls (the
"Valukas Report"), Valukas provided a detailed chronology exposing a total
breakdown of the Company's risk, safety and recall practices – which were so bad that
the ignition switch problem was ultimately exposed not by GM itself, but by
investigators and experts retained by plaintiffs' lawyers in personal injury litigation
arising from vehicle accidents.

4.      As detailed below, starting no later than 2002, GM manufactured and sold
several models of vehicles based on a common "Delta" platform equipped with the
defective ignition switch. Problems with moving shutdowns of GM vehicles became
apparent almost immediately. Notwithstanding clear internal and legal directives that
this phenomenon constituted a safety problem requiring immediate recall, GM papered
over the issue with a false and misleading 2005 service bulletin to consumers, and a
redesign of the subject switch in 2006 – but only for new cars.

5.      By approximately the spring of 2012, certain GM personnel knew that the
defective switch could also cause frontal airbag non-deployment in at least some
model years of GM's Chevrolet Cobalt, and were already aware of several fatal

incidents and serious injuries that occurred as a result of accidents in which the defective switch caused or contributed to airbag non-deployment. This knowledge extended well above the ranks of investigating engineers to, at least, certain supervisors and attorneys at the Company. Yet, GM failed to report the problem to the National Highway Transportation Safety Administration ("NHTSA"), as required, for almost 2 years. And throughout this period, GM failed to correct the false and misleading 2005 service bulletin remarkably stating that the subject ignition switch, which caused moving shutdowns, posed no "safety" problem for drivers.

6.     In addition to dozens of fatalities caused by the defective ignition switch and GM's subsequent delay and obfuscation, GM's belated recall of the unsafe cars resulted in massive corporate losses, including a maximum **$35 million penalty** to NHTSA – the largest sum the regulator may legally impose on a car manufacturer. In September 2015, it was announced that GM would pay a **$900 million forfeiture** in connection with a deferred prosecution agreement ("DPA") entered into with U.S. Attorney Preet Bharara of the Southern District of New York. As Mr. Bharara stated at the time, "[T]o sum it up, they didn't tell the truth in the best way that they should have, to their regulators, to the public, about the serious safety defects that risked life and limb."

7.     In addition to causing or allowing these illegal and reckless practices to occur and persist, defendants actively misled GM's own shareholders about GM's

4

business and operations. In recent years, GM has falsely stated that "[k]eeping drivers and passengers safe in and around vehicles is a ***top priority*** for our company." GM has stated that "[o]ur customers' peace of mind is ***the most important thing***" and "***it's their safety that we have in mind.***" GM has stated that its approach to "safety and occupant protection is one of ***the most comprehensive*** in the industry" and that "[h]ow a vehicle performs in the real world is ***an important source*** of information for driving continuous improvement and innovation in vehicle safety." Plainly, these statements were untrue and indefensible.

8.     In September 2015, it was announced that GM would pay **$300 million** to settle claims for securities fraud pending against it (and some defendants named herein) in the action captioned *New York State Teachers' Retirement System v. General Motors Company, et al.*, No. 14-cv-11191 (E.D. Mich.) (the "Securities Class Action").  In that case, plaintiffs alleged that GM's officers issued false statements regarding the Company's liabilities, internal controls, and purported commitment to safety, and in doing so acted with scienter, or intent to defraud stock purchasers. GM paid this $300 million sum to purchasers of GM stock between 2011 and 2014 without even awaiting the outcome of its then-pending motion to dismiss, a highly unusual circumstance given the stringent pleading standards imposed on plaintiffs by the Private Securities Litigation Reform Act of 1995 ("PSLRA").

9.      In addition to these massive payments, GM continues to be exposed to billions of dollars more in charges and damages arising out of class action and personal injury litigation which is ongoing. In addition, pursuant to the GM Ignition Compensation Claims Resolution Facility administered by Kenneth Feinberg, GM has offered approximately **$600 million** to injury claimants. According to Mr. Feinberg, as of late 2015, over 120 death claims had been paid.

10.      On January 18, 2017, GM also agreed to pay a **$1 million penalty** to settle charges with the SEC that the Company's deficient internal accounting controls prevented GM from properly assessing the impact on its financial statements of a defective ignition switch found in its vehicles. The SEC's Order found that GM's internal investigation involving the defective ignition switch was not brought to the attention of its accountants until November 2013, even though other GM personnel understood at least 18 months earlier (in the spring of 2012) that there was a safety issue at hand.

11.      As defendant Mary T. Barra ("Barra") admitted in March 2014, "something went wrong with our process in this instance and terrible things happened." Barra further admitted to a culture that put profits over safety. These events raised immediate questions as to whether GM's senior managers fulfilled their fiduciary duties of (a) prudent and effective design and management of the Company's

6

operations, and (b) full and honest disclosure to shareholders. As alleged herein, they did not.

12.     In light of the damaging events described herein, on April 30, 2015, plaintiff made a demand on the Board of Directors of GM to (a) undertake an independent internal investigation into GM's current and former officers and directors' breaches of fiduciary duties, and (b) sue all parties at the Company responsible for this fiasco. The Board failed to act. Instead, in a letter to plaintiff dated June 24, 2015, a GM lawyer stated that the Board would await a ruling in a factually similar shareholder derivative action pending in the Delaware Chancery Court before responding to the demand. In that case, the plaintiffs *failed* to make a demand, and GM moved to dismiss the complaint for failure to allege demand futility. On June 26, 2015, the Delaware Chancery Court dismissed the complaint for failure to allege demand futility with sufficient particularity.

13.     Rather than promptly acting on plaintiff's demand at that time, as the Board had stated it would do in its June 24, 2015 letter, by letter dated September 15, 2015, a GM lawyer advised plaintiff that the Board would *again* defer consideration of plaintiff's demand because the Delaware plaintiffs had taken an appeal. According to the September 15, 2015 letter, the Board wanted to await the "disposition" of the appeal before taking any further steps. The Board's stalling and failure to act for an

indefinite period as GM's huge losses continued to mount was not reasonable or in good faith.

14.    By letter dated March 4, 2016 – almost a full year after plaintiff made his demand – the Board advised plaintiff that the Delaware appeal had concluded, and that it would finally "proceed to consider" whether it was in GM's best interests to "pursue the claims that your client seeks to assert derivatively in the complaint." By letter dated June 14, 2016, the Board refused the demand, announcing that there were no viable claims to be brought against the four individuals named as defendants in this action.

15.    As alleged below, there is more than a reasonable doubt that the Board's decision to refuse was a valid exercise of business judgment. The Board failed to ensure that the demand was evaluated by an independent committee of disinterested directors, instead permitting a conflicted majority to retain control of the investigation and the decision to refuse despite being the targets of ongoing litigation involving the same wrongful conduct. In addition, the Board's investigation was neither reasonable nor performed in good faith. For instance, the Board failed to interview a single adverse party, regulator, or witness in the course of its investigation. Rather than consult with a representative of the U.S. Department of Justice, NHTSA, or SEC, persons involved in the two Congressional investigations, or plaintiffs' attorneys involved in the product liability, personal injury and consumer class actions – whose respective investigations and litigation are specifically referenced in plaintiff's demand

– the Board chose to instead rely only on the inherently less probative statements of current and former GM personnel and representatives. This failure to seek out any contrary voice from outside the Company totally undermines the Board's findings.

16.    Among the other defects alleged herein, the Board: (a) failed to reconcile its conclusion of no actionable wrongdoing by any director, officer or executive with the admissions in the DPA that GM engaged in criminal conduct, disregarding the DPA's incriminating nature; (b) improperly restricted the primary scope of its investigation to just four individual officers and directors, notwithstanding plaintiff's demand that any and all responsible directors, officers and executives be held to account; (c) retained counsel to assist with the investigation which has prior and ongoing relationships with both GM and certain of the individuals investigated, without any consideration of these lucrative interrelationships and debilitating conflicts of interest; (d) ignored plaintiff's detailed and particularized allegations of the defendants' alleged misconduct; (e) failed to reconcile its findings with the Company's decision to quickly settle the Securities Class Action for $300 million amount prior to even resolving motion practice; (f) based its conclusion, in part, on a stale 2014 report purportedly responsive to an earlier litigation demand by a different GM shareholder, which was generated prior to the DPA and other factual revelations highly adverse to GM; and (g) improperly shielded the underlying report referenced in the June 2016 letter by refusing plaintiff's review thereof without a justified basis.

17.    The Board's flawed process and lack of diligence described herein supports the reasonable inference that its investigation was not the product of an independent review, that it was unreasonable, and that its decision-making process was not undertaken in good faith. Accordingly, plaintiff's demand was wrongfully refused and this action – which seeks to recoup the losses that GM has sustained, and will continue sustaining, in connection with the ignition switch disaster and all related proceedings – must now proceed.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because complete diversity exists between plaintiff and each defendant and the amount in controversy exceeds $75,000 exclusive of interest and costs. This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

19.    This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, a citizen of Michigan, or is an individual with sufficient minimum contacts with this District so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

20.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because GM maintains its principal place of business in this District, one or more of the

defendants resides in or maintains executive offices in this District, a substantial

portion of the transactions complained of herein occurred in this District, and

defendants have received substantial compensation in this District by doing business

here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### Plaintiff

21.    Plaintiff Daniel J. Carro ("Carro") is a current holder of GM stock and

held his shares during the relevant period alleged herein. Carro is a citizen of New

York.

### Nominal Defendant

22.    Nominal Defendant GM is a Delaware corporation with its principal place

of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of

the States of Delaware and Michigan. "New" GM was incorporated in 2009 and,

effective on July 11, 2009, acquired substantially all assets and assumed certain

liabilities of "old" GM.

### Individual Defendants

23.    Defendant Barra is currently GM's Chairman and CEO. For over 33

years, Barra has worked for or been affiliated with GM and has been described as a

GM "lifer." Barra began her career with GM in 1980 as a General Motors Institute co-

op student at the Pontiac Motor Division. In 1990, Barra graduated with a Masters in

Business Administration from the Stanford Graduate School of Business after receiving a GM fellowship in 1988. After graduating from business school, Barra returned to GM and served in various roles at the Company. By 2004, as GM was preparing to launch the 2005 Cobalt, Barra was plant manager of the Company's Detroit-Hamtramck plant, which made Cadillacs, Buicks and Pontiacs. Then, as Executive Director, and later Vice President, of Manufacturing Engineering from 2004 to 2009, Barra worked to overhaul and streamline GM's production plants and processes in order to "trim development costs and move products to market quicker." Barra then served as Senior Vice President, Global Product Development from 2011 to 2013, and then Executive Vice President, Global Product Development, Purchasing & Supply Chain from August 2013 until her January 15, 2014 appointment as CEO. The executives in both of these positions are referred to as GM's "Product Chief" and in that role Barra was responsible for the design, engineering, program management and quality of GM vehicles around the world. On information and belief, Barra is a citizen of Michigan.

24.    Defendant Daniel F. Akerson ("Akerson") is a former CEO of GM, having succeeded Edward Whitacre, Jr. as CEO of GM and assumed the position of Chairman of GM's Board in January 2011. On information and belief, Akerson is a citizen of Virginia.

25.    Defendant Michael P. Millikin ("Millikin") became Senior Vice President and General Counsel of GM in July 2009, after more than three decades in various positions in GM's legal department. In October 2014, it was announced that Millikin would "retire" from GM. On information and belief, Millikin is a citizen of Michigan.

26.    Defendant John Calabrese ("Calabrese") was at relevant times Vice President Global Vehicle Engineering. On April 22, 2014, Calabrese, who had been with GM for more than 33 years and had been Vice President of Global Vehicle Engineering since April 2011, "elected to retire." On information and belief, Calabrese is a citizen of Michigan.

27.    Defendants Barra, Akerson, Millikin and Calabrese are sometimes referred to as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### I.    Company Background.

28.    GM was founded in 1908 and is based in Detroit, Michigan. GM is an automobile manufacturer that designs and engineers vehicles. GM currently produces, sells and services its vehicles through its numerous brands in more than 120 countries around the world, including the Chevrolet, Buick, GMC, and Cadillac brands. By 2001, GM's U.S. market share had fallen to approximately 20%, and global competitors and the 2008 financial crisis contributed to the Company's increasingly critical cash flow problems.

29.    In the face of these challenges, GM reduced costs by cutting production, pressuring suppliers to lower costs, reducing health care and pension spending, and reducing its workforce. As a cost-cutting measure, in 2004, GM decreased its engineering headcount by consolidating 11 engineering centers in the U.S. into one unit and adding to the responsibilities of its engineering personnel. This created an environment in which GM's engineers were overworked, one person was required to do the job of many, and the quality of the engineers' work suffered accordingly.

30.    On June 1, 2009, GM filed for bankruptcy protection. On July 10, 2009, GM emerged from bankruptcy protection with formal assistance of the U.S. government, which made a substantial capital investment in the Company. The "new" GM acquired many of "old" GM's key assets, including the four core U.S. brands: Chevrolet, Buick, GMC, and Cadillac.

31.    After the bankruptcy, GM claimed that it had emerged as a new and improved organization. In the Company's 2010 Annual Report, dated March 1, 2011, the Company assured shareholders that "we truly are building a new GM, from the inside out. Our vision is clear: to design, build and sell the world's best vehicles, and we have a new business model to bring that vision to life. We have a lower cost structure, a stronger balance sheet, and a dramatically lower risk profile. We have a new leadership team – a strong mix of executive talent from outside the industry and automotive veterans – and a passionate, rejuvenated workforce."

14

32.    GM also claimed in the 2010 Annual Report that it had a new "culture" and a "new attitude," touting that "we are making major strides in becoming a GM that works smart, thinks big and moves fast. The GM culture values simplicity, agility and action – making and implementing decisions faster, pushing accountability deeper into the organization and demanding results from everyone."

33.    Similarly, in the Company's 2011 Annual Report, dated February 27, 2012, GM claimed that it was putting its customers first, stating that "Every driver of a GM car … is a driver of our growth. We're putting our vision in motion by putting our customers first – executing our strategy to attract and delight more of them every day, all over the world."  GM also announced that it was dedicated to leadership in vehicle safety, stating that "We are committed to leadership in vehicle design, quality, reliability, telematics and infotainment and safety."

34.    GM made many statements such as this during the relevant period in SEC filings, public statements and product advertising. As detailed below, GM's assurances about its business, operations and commitment to "safety" were totally false.

## II.    Chronology of the Ignition Switch Defect.

### a.    Summary.

35.    The ignition switch defect at issue is a low-torque ignition switch installed in many GM vehicles which, under certain circumstances, may move out of the "Run" position. If this movement occurs, the driver loses the assistance of power steering and

power brakes. And if a collision occurs while the switch is in the "Accessory" or "Off" position, the vehicle's safety airbags may fail to deploy—increasing the risk of death and serious injury in crashes in which the airbag was otherwise designed to operate. Many of the impacted model year cars were based on GM's uniform "Delta" automobile platform, and included the 2005, 2006, and 2007 Chevrolet Cobalt; the 2005, 2006, and 2007 Pontiac G5; the 2003, 2004, 2005, 2006, and 2007 Saturn Ion; the 2006 and 2007 Chevrolet HHR; the 2007 Saturn Sky; and the 2006 and 2007 Pontiac Solstice.

36.    Before the defective switch went into production in 2002, certain GM engineers knew that it was prone to movement out of the Run position. Testing of a prototype showed that the torque return between the Run and Accessory positions fell below GM's own internal specifications. But the engineer in charge of the defective switch approved its production anyway.

37.    In or about 2004 and 2005, as GM employees, media representatives, and GM customers began to experience sudden stalls and engine shutoffs caused by the switch, GM considered fixing the problem. However, having incredibly decided that the switch did not pose a safety concern, and citing cost and other factors, engineers opted to leave the switch as it was and simply promulgate an advisory to dealerships with tips on how to minimize the risk of unexpected movement out of the Run

position. GM even rejected a simple improvement to the head of the key that would have significantly reduced unexpected shutoffs at a price of less than $1 per car.

38.     At the same time, in or about June 2005, GM issued a statement that acknowledged circumstances where the ignition key could inadvertently move to the Accessory or Off position when the engine was running. In response to a further inquiry, GM informed a newspaper that GM did not believe the inadvertent rotation of the ignition key was a safety issue.

39.     From approximately the spring of 2012, certain GM personnel knew that the switch presented a safety defect because it could cause airbag non-deployment associated with death and serious injury. Yet not until approximately 20 months later, in February 2014, did GM first notify NHTSA and the public of the connection between the problem switch and fatal airbag non-deployment incidents. This announcement accompanied an initial recall of approximately 700,000 vehicles – a number that would grow to more than 2 million by March 2014.

40.     Inside GM, certain personnel responsible for shepherding safety defects through GM's internal recall process delayed this recall until GM could fully package, present, explain, and handle the deadly problem, taking affirmative steps to keep the matter outside the normal process. On at least two occasions while the condition was well known by some within GM but not disclosed to the public or NHTSA, certain GM personnel made incomplete and misleading presentations to NHTSA assuring that

17

GM would and did act promptly, effectively, and in accordance with its formal recall policy to respond to safety problems – including airbag-related safety defects.

41.    For much of the period during which GM failed to disclose this safety defect, it not only failed to correct its 2005 assurances that the switch posed no safety concern, but also actively touted the reliability and safety of cars equipped with the switch, with a view to promoting sales of used GM cars. Although GM sold no new cars equipped with the switch during this period, GM dealers were still, from in or about the spring of 2012 through in or about the spring of 2013, selling pre-owned Chevrolet, Pontiac, and Saturn brand cars that would later become subject to the February 2014 recalls. These sales were accompanied by certifications from GM, assuring the unwitting consumers that the vehicles' components met all safety standards.

### b.    The Regulatory System and GM's Recall Procedures.

42.    NHTSA is a federal agency charged with ensuring that manufacturers of motor vehicles comply with the safety standards contained in the National Traffic and Motor Vehicle Safety Act of 1966, codified at 49 U.S. Code Chapter 31 (the "Safety Act").

43.    Under applicable regulations, GM was required to disclose to NHTSA any "defect . . . related to motor vehicle safety," defined as "performance of a motor vehicle . . . in a way that protects the public against unreasonable risk of accidents . . .

18

and against unreasonable risk of death or injury in an accident." Such disclosure had to

be "submitted not more than 5 working days after a defect in a vehicle or item of

equipment ha[d] been determined to be safety related."

44.    The required disclosure was to be made by filing a "Defect Information

Report" or "DIR" with NHTSA. An auto manufacturer's filing of a DIR with NHTSA

is commonly referred to as a "recall." GM had a formal recall decision-making

process, called the Field Performance Evaluation or "FPE" process, the steps of which

were well documented. According to Company policy, the FPE process was supposed

to be initiated by dedicated engineers in the Product Investigations ("PI") group, which

was at all relevant times headed by GM's Director of Safety & Crashworthiness or

Director of Product Investigations, who was responsible for identifying and

investigating suspected safety and compliance problems with GM cars.

45.    Once PI had completed its investigation of a safety problem, it would

hand the matter off from the engineering side to the "Quality" organization –

specifically, to the "FPE Director." This meant presenting the problem at a weekly

Investigation Status Review ("ISR") meeting attended by the FPE Director, GM' s

Director of Safety & Crashworthiness or Director of Product Investigations, and a

member of GM's legal department.

46.    If, based on PI's presentation at the ISR, these individuals believed that

the matter involved a potential safety defect, they were to advance it for

consideration by the Performance Field Evaluation Team ("PFET"). The PFET had no recall decision-making authority but was tasked with gathering information needed to execute a potential recall.

47.    At roughly the same time that the PFET was apprised of the issue, the matter was also supposed to go before the Field Performance Evaluation Review Committee ("FPERC"). The FPERC would make a preliminary decision about whether the issue under consideration qualified as a "defect . . . related to motor vehicle safety" and warranted a recall. It would then transmit its conclusion to the decision-making body, the Executive Field Action Decision Committee ("EFADC"), which was made up of three GM Vice Presidents.

48.    Typically, the EFADC's decision would follow within approximately a week of the FPET's and the FPERC's consideration of the matter. If the EFADC voted for a recall, the decision would be reported to NHTSA within five business days, at which time a DIR would also be filed.

### c.    Warning Signs from Inception.

49.    In the early 2000s, GM launched a series of compact cars that it marketed as affordable, safe, and fuel-efficient. One of these small cars was the Saturn Ion. Another was the Cobalt. These two models belonged to GM's "Delta" platform, and from their respective launches until around late 2006 both were equipped with the defective ignition switch. The defective ignition switch would

also be installed in other, less popular Chevrolet, Saturn, and Pontiac models from about 2004 through about late 2006.

50.    Development of the switch that would end up first in the Ion and then Cobalt and the other models began in the late 1990s. By March 2001, the GM design engineer then in charge of the Ion's switch had designed the specifications and communicated them to the supplier. Among the specifications communicated to the supplier was the minimum torque necessary to move the switch from Run to Accessory. This torque performance was to be maintained by a detent plunger and spring within the switch.

51.    Testing conducted by the supplier in 2001 and early 2002 revealed that an early version of the pre-production switch was not meeting the torque specification; it repeatedly scored "Not OK." A July 2001 pre-production report for the Ion within GM made the same observation: the switch had "low detent plunger force."

52.    In email correspondence between the engineer and the supplier in early 2002, the supplier confirmed that an early version of the switch was not meeting the torque specification and outlined the problems that might arise if the part were brought into compliance – including pressure on other switch components, delay, and increased costs.

53.    Saying that he was "tired of the switch from hell" and did not want to either compromise the electrical performance of the switch or slow the production schedule, the design engineer directed the supplier to "maintain present course" notwithstanding that there was "still too soft of a detent." Accordingly, the defective switch was put into production and installed into the first model year of the Ion (model year 2003), which was first sold to the public in 2002. By email dated March 28, 2002, the design engineer recommended that the switch also be used in the Cobalt, which was yet to launch.

54.    Almost immediately, customers began to report problems with cars equipped with the defective switch. Remarkably, GM employees tasked with driving early production models of the Ion and then the Cobalt were reporting stalls while driving, and some of them were attributable to easy rotation of the key within the defective switch.

55.    Members of the press covering the Cobalt's launch also experienced the unexpected shutoff problem. Alerted by one of the press reports, two GM managers in charge of safety determined to experience the phenomenon for themselves. In June 2005, they test drove a Cobalt and found that, as reported, contact with the driver's knee could lead to a stall.

56.    Shortly afterward, GM issued a press statement acknowledging the problem as it pertained to the Cobalt, which had the greatest number of consumer

complaints. According to the statement, "In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is running." The press release further recommended that drivers remove "nonessential material from their key rings." Before its public release, this statement was reviewed and approved by various GM officials. In a response to further media inquiry, GM stated that it did not believe this condition presented a safety concern.

57.    A June 2005 Cleveland Plain Dealer article reporting on the ignition switch problem commented that "you have to admit it is pretty funny to hear somebody pretend that turning off the engine by mistake isn't a safety issue." Just days before this article was published, GM engineers working on the Pontiac Solstice, another new car equipped with the defective switch, learned of a complaint about a Solstice that had experienced the same inadvertent shutoff problem as had been reported in the Ion and the Cobalt.

d.    **The Misleading 2005 Service Bulletin.**

58.    In November 2004, the Company opened the first of several engineering inquiries that would be initiated in the ensuing years to address the problem. This first inquiry was closed "with no action" in March 2005. Fixes such as improving the torque performance of the defective switch itself and changing

the head of the associated key were rejected as not representing "an acceptable business case." GM engineers concluded that each proposed solution would take too long to implement, would cost too much, and would not fully fix "the possibility of the key being turned (ignition turn off) during driving."

59.    Not everyone involved in the November 2004 engineering inquiry agreed with this outcome. One manager for the Cobalt believed that the ignition switch presented a potential safety problem because it could cause sudden loss of power steering and power brakes. He thought a remedy should have been implemented without regard to cost concerns.

60.    Meanwhile, in February 2005, while the November 2004 engineering inquiry was still open, the Company released a "Preliminary Information" to its dealers aimed at helping them diagnose and address the defective switch problem. This publication explained that "key ignition cylinder torque/effort" could cause "Engine Stalls."

61.    In May 2005, just two months after the November 2004 engineering inquiry into the defective switch was closed without action, a GM brand quality manager opened a second inquiry to consider fixing the problem, but only for new cars. This manager cited a customer complaint that the "vehicle ignition will turn off while driving," and noted that GM was having to buy back Cobalts as a result of the defective switch.

62.   Still not believing this was a safety issue, GM engineers closed this inquiry too, without issuing a recall. Although GM engineers initially resolved to fix the low torque problem for newly-produced 2007 Cobalts by changing the design of the key head so that the key ring would sit in a "hole" rather than a "slot," they ultimately rejected this solution. GM continued selling new cars equipped with the defective switch and slot-head key.

63.   Meanwhile, GM's PI group, which was responsible for addressing problems with cars already on the road, began to study the low torque issue in the summer of 2005. Like the engineering inquiries targeting new cars, this investigation essentially went nowhere. Although PI engineers presented the matter to the ISR (the first stage of the potential recall process), it was decided that the problem did not present a safety concern and thus did not warrant further consideration for a recall. At the time, neither PI nor any member of the ISR recognized that the airbag system was among the electronic systems disabled by the defect.

64.   Having determined that the problem did not pose a safety concern and thus need not be considered further for recall, GM simply replaced the February 2005 Preliminary Information with a more formal "Service Bulletin" to its dealers, alerting them to an "inadvertent turning off" problem and instructing them to provide any complaining customers with inserts that would transform the key slot

into a hole and thus reduce the lever arm. Unlike the Preliminary Information, which accurately described the condition caused by the defective switch as a "stall," the 2005 Service Bulletin omitted that word. Thus, a dealer responding to a customer inquiry would not locate the bulletin if he or she only used the word "stall" in the search.

65.    This omission of the word "stall" from the 2005 Service Bulletin was deliberate. The PI senior manager who oversaw and could control the wording of GM service bulletins directed that the word be kept out of this bulletin even though he knew customers would naturally describe the problem as "stalling." The reason for the omission was to avoid attracting the attention of GM's regulator, NHTSA. As it happened, in the interim between the February 2005 Preliminary Information and the 2005 Service Bulletin, some within GM had been meeting with representatives of NHTSA to try to persuade them that defects causing vehicles to stall were not necessarily safety defects warranting recall action.

66.    Although the 2005 Service Bulletin referenced not just the Cobalt, and although it was updated in October 2006 to cover model year 2007 versions, only about 430 customers would ultimately receive the bulletin's recommended key-head inserts between 2005 and 2014.

67.    As of the spring of 2006, the 2005 Service Bulletin was the lone measure in place to address the defective switch. There were no systematic efforts

to provide key modifications for all owners of affected cars – or even all owners who came into dealerships for service. And every day more and more new cars with the defective switch were being sold.

### e.    The Switch is Redesigned.

68.    In April 2006, the original design engineer authorized a replacement switch for new cars with significantly greater torque. The engineer further directed, in contravention of accepted GM practice, that this change be implemented without a corresponding part number change. As a result, no one looking at the switch would be able to tell the difference between the old, defective switch and the new, non-defective one, without taking it apart.

69.    Although it was effectuated without a part number change, the switch change was documented internally, and other engineers were aware of it at the time and afterward. For example, a March 2007 note logged in connection with an engineering inquiry into another matter related to the Ion specifically observed that "[t]he detent plunger torque force was increased" by the original design engineer in April 2006.

70.    Another relevant change to the Cobalt was made in 2009. Having previously rejected the slot-to-hole alteration to the key head design, GM finally decided to implement that change. An engineer involved in the decision wrote at

the time: "This issue has been around since man first lumbered out of [the] sea and stood on two feet." This change went into effect for the model year 2010 Cobalt.

f.    **Accident Litigation.**

71.    As GM acknowledged in its 2005 Service Bulletin, the defective switch could result in a "loss of electrical system[s]." These electrical systems included power steering and power brakes, but also the diagnostic module or "SDM" in the vehicle, which controlled airbag deployment. Internal GM documents reflect that certain employees understood by 2001 that there was a connection between a loss of electrical systems and non-deployment of airbags.

72.    The deadly effects of the defective switch began manifesting themselves early on. In July 2004, a driver died in a crash of an Ion after her airbags failed to deploy. A few months later, in November 2004, the passenger of a 2004 Ion died in another crash where the airbags failed to deploy. In June 2005, a driver suffered serious injuries after his 2005 Ion crashed and the airbags failed to deploy. For each of these incidents, the SDM data recovered from the crashed vehicles proved uninformative because, unlike the SDM installed the in the Cobalt, the Ion's SDM was incapable of recording data after the vehicle had lost power.

73.    The Cobalt SDM data, by contrast, reflected a number of non-deployments accompanied by a power mode status recording of Accessory or Off. In July 2005, just months after GM closed its first engineering inquiry into the

defective switch, a 16-year-old driver died in Maryland when the airbags in her 2005 failed Cobalt to deploy. The power mode status recorded for that vehicle at the time of the crash was Accessory.

74.    In October 2006, two more teenagers died, also in a 2005 Cobalt, in Wisconsin, when the airbags failed to deploy. The police officer who examined the crashed vehicle noted in a February 2007 accident report that the ignition switch "appeared to have been in the accessory position . . . preventing the airbags from deploying." An April 2007 report about the same crash prepared at Indiana University likewise posited that the airbags had failed to deploy because the key was in the Accessory position. This report even specifically referenced the October 2006 version of the 2005 Service Bulletin, which described the defective switch.

75.    In the spring of 2007, NHTSA approached GM to express concern about the high number of airbag non-deployment complaints in Cobalts and Ions. Around this same time, and as a result of NHTSA's inquiries, a GM field performance assessment engineer with expertise in airbags who worked with GM's lawyers began to track reports of crashes in Cobalts where the airbags failed to deploy. In May 2007, the PI group even placed the issue of Cobalt airbag non-deployment into the first stage of GM's recall process, but no follow-up occurred.

76.    In September 2008, a crash involving a 2006 Cobalt killed two people when the airbags failed to deploy. GM sent the car's SDM to the Company's SDM

supplier for examination. In May 2009, the SDM supplier reported that the power mode status was recorded as Off, and that this was one of two possible explanations for the failure of the airbags to deploy. This report was provided in writing and in person at a meeting attended by several GM employees – including a member of the PI group, in-house counsel, and the field performance assessment engineer who had been tracking the Cobalt airbag non-deploy incidents.

77.   By March 2010, GM had conducted a safety recall for a power steering problem in the Cobalt unrelated to the defective ignition switch, in which it acknowledged that loss of power steering, standing alone, constituted a "defect . . . relate[d] to motor vehicle safety" and thus warranted recall action. The defective switch caused this same problem, as was specifically acknowledged by GM. Yet at no time before February 2014 did GM announce a recall for cars associated with the defective switch.

78.   Many of the deaths and serious injuries associated with airbag non-deployment became the subject of legal claims against GM. Cobalt and Ion non-deployment cases began reaching GM's legal staff in late 2005 and 2006. GM had a structured settlement process to deal with accident litigation by which GM decided whether and for how much a case should be settled.

79.   At the lowest monetary level, product litigation staff attorneys were vested with $100,000 in settlement authority. Settlements of between $100,000 and

$ 1.5 million (later increased to $2 million) required approval at a committee known as the Roundtable. The Roundtable Committee met weekly and all product litigation staff attorneys were invited to attend. Settlement offers between $2 and $5 million required approval of a group called the Settlement Review Committee ("SRC"), which met monthly, and was chaired by the head of global litigation. Cases over $5 million required approval by the GM's General Counsel – defendant Millikin.

80.    Certain GM lawyers, aided by the field performance assessment engineer and others who assisted in evaluating causes of crashes, realized by no later than early 2011 that a number of the non-deployment cases involved an "anomaly" in the ignition switch.

81.    Specifically, in connection with a crash in Tennessee, a GM engineer explained to legal staff that when the ignition switch power mode status is in Off (as it was in that case), the SDM "powers down," and the airbags fail to deploy. The engineer further opined that "a crash sensing system 'anomaly'" resulting in a power mode status of Off had indeed caused non- deployment in that case. GM promptly settled the Tennessee case.

82.    Just days before that settlement, a 15 year old girl in South Carolina crashed her mother's 2007 Cobalt and suffered significant injuries when the airbag did not deploy. The power mode status was recorded as Accessory at the time of

the crash. GM engineers evaluating the crash theorized that, as in the case of the Tennessee crash, the non-deployment may have been caused by a crash sensing "anomaly" related to the ignition switch.

83.    Meanwhile, the GM attorney principally responsible for airbag non-deployment claims had become familiar with a number of Cobalt non-deployment incidents, and grew concerned that the "anomaly" was getting insufficient attention from the PI group, which was supposed to investigate and fix safety problems with cars on the road. At the time, no one within GM had yet sourced the "anomaly" to the defective switch's torque problem.

84.    Certain members of the legal department took the unusual step of arranging a meeting with PI. The meeting, which took place on July 27, 2011, was attended by the PI senior manager and the Director of Product Investigations. Also present were the field performance assessment engineer, a GM airbag attorney, and a GM safety attorney. In advance of the meeting, the PI senior manager wrote to a colleague that the Cobalt airbag non-deployment problem was "ugly" and would make for "a difficult investigation."

85.    At the July 27, 2011 meeting, the field assessment performance engineer showed photographs of three of the most serious non-deployment crashes he had seen involving Cobalts and specifically highlighted his observations that

many of the Cobalt non-deployment crashes had occurred while the power mode was in the Accessory or Off position.

86.    After the meeting, one of the first steps PI took was to gather information from the engineer who had been tracking non-deployment incidents in Cobalts since 2007, and who had been involved in evaluating a number of crashes that were the subject of Cobalt non-deployment legal claims. The engineer explained to the PI investigator that he had observed that in some cases the power mode was recorded as either Accessory or Off at the time of the crash. The engineer further noted that the non-deployment problem appeared to be limited to 2005-2007 model years of the Cobalt and appeared not to affect model years 2008 and later.

### g.    Additional Investigation.

87.    By March 2012, more than six months after he had been assigned to the matter, the PI investigator had done little to advance the investigation. During a meeting with several GM employees, the PI investigator complained that he needed more support from GM's electrical engineering group to investigate a potential electrical (as opposed to mechanical) explanation for the Accessory and Off power mode recordings in many of the subject crashes.

88.    Two weeks later, the field performance assessment engineer, members of GM's electrical engineering group, and others travelled to an auto salvage yard

33

to examine whether the Accessory and Off power mode status recordings within the SDMs were attributable to an electrical "bounce" in the ignition switch. Following this investigation, a GM electrical engineer reported his view that a probable root cause of the non-deployment problem was the switch moving out of Run to Accessory or Off.

89.    In an April 23, 2012 email responding to a query about an ignition switch turning too easily from Run to Off, the PI senior manager wrote to colleagues claiming that he had "not heard of" complaints about low torque in the "Cobalt or other models" since 2005, when the first PI examination was conducted and closed with the issuance of the 2005 Service Bulletin. The PI investigator, meanwhile, pressed electrical engineers to continue to look into other possible causes of non-deployment, beyond the low torque problem.

90.    In May 2012, the GM safety attorney asked a GM Vice President (since retired) to act as an "Executive Champion" of the investigation in order to move the matter forward. During the first meeting chaired by the Executive Champion, on May 15, 2012, the GM electrical engineer presented his view that the defective switch was the cause of non-deployment in the affected Cobalt models. Those in attendance included the GM safety attorney, the GM safety director, the PI senior manager, the PI investigator, and others. The Executive

Champion encouraged confirmation of this hypothesis through more scientific study.

91.   On May 22, 2012, confirmation was obtained. The GM electrical engineer, the PI investigator, and others traveled again to an auto salvage yard and conducted a thorough study of torque ignition in the switches of several model years of Cobalt, Ion, and other cars. The results confirmed that the majority of vehicles from model years 2003 through 2007 exhibited torque performance below the torque specification GM adopted in 2001. They also showed that somewhere starting in model year 2007, the values were within specification.

92.   The observed discrepancy was due to the ignition switch part change that the design engineer had ordered in April 2006. But, no one working on the airbag non-deployment investigation in the spring of 2012 knew about that part change, as the part number was the same for the defective switch and the new one. Indeed, when the PI investigator asked the switch engineer in early 2012 to detail any changes that might account for the discrepancy observed at the salvage yard, the design engineer denied knowledge.

93.   Still, the engineers involved knew that studied cars built before 2006 were equipped in with low-torque ignition switches, and that low torque in an ignition switch could result in airbag non-deployment. At this time, no further engineering tests were conducted to explore any other purported root cause of the

35

non-deployment pattern or to compare the 2005 through 2007 model year Cobalt
ignition switches with those of later model years.

94.   On June 12, 2012, three weeks after the May 2012 salvage yard
expedition, an expert retained by certain plaintiffs in a Virginia crash issued a
report. Noting both the 2005 Service Bulletin and the Indiana University study
from 2007 that had identified a connection between the defective switch and non-
deployment of an airbag in a fatal Cobalt crash, the expert opined that the defective
switch was responsible for non-deployment.

95.   At a meeting among GM lawyers in late July 2012 in which the
Virginia expert's report was discussed, a newly hired GM attorney asked the group
why the Cobalt had not been recalled for the defective switch. Those present
explained that the engineers had yet to devise a solution to the problem but that it
was being looked into.

96.   The PI investigator, the PI senior manager, the GM safety attorney, the
GM safety director, and others met at lengthy intervals through the summer and
fall of 2012 and early 2013 to address the issue.  The purpose of the meetings was
not to identify the root cause of the problem, but rather to develop the optimal
remedy and define the scope of the anticipated recall.

97.   Certain GM personnel wanted to be sure that the fix would be
affordable and yet appeal to consumers; that GM would have sufficient parts on

hand; and that GM representatives would be able to fully articulate to NHTSA and the public a "complete root cause" accounting for the discrepancy between the earlier and later vehicle populations.

### h.    Misleading Statements to NHTSA in 2012.

98.    The manner in which the responsible GM personnel were approaching the defective switch and its deadly consequences in 2012 contrasted with the picture the Company was presenting to NHTSA about its recall process.

99.    On October 22, 2012, certain GM personnel met with NHTSA officials in Washington, D.C. and gave a description of the Company's recall process intended to assure that safety issues were routinely addressed. The presentation touted a "common global process" with "standard work templates" and explained that the first step toward a potential recall involved investigation by PI of the suspected safety problem. Then, according to the presentation, the matter would be placed promptly into the FPE process, which was controlled not by engineers but by personnel in charge of quality. At this stage, the FPET would consider the logistics of implementing the proposed recall or other contemplated action; the FPERC would recommend the particular field action to be taken; and the EFADC would make a decision. GM gave the impression that its recall process was linear, robust, uniform, and prompt.

100. While this presentation may have described GM's general recall process and handling of other defects, it did not accurately reflect GM's handling of the defective switch (about which NHTSA would remain unaware of until 2014). Indeed, several months prior to this presentation, certain GM personnel had identified what they knew to be a dangerous safety defect and had not initiated the first phase of the recall process.

### i.    The Defect is Identified But Recall is Delayed.

101. By early 2013, the defective switch still had not been introduced into the FPE process. GM was exploring optimal remedies and trying to understand why the defect appeared to affect only a limited population of vehicles. Those involved remained unaware of the part change that the design engineer had made back in April 2006 – the change that explained why cars built after around late 2006 seemed not to be affected.

102. Meanwhile, GM lawyers were engaged in litigation related to a crash in Georgia. The plaintiff's attorney in that case had learned about the 2005 Service Bulletin and had developed a theory that the defective switch caused the driver to lose control of her vehicle. The attorney sought related discovery from GM, including regarding any design changes to the ignition switch. In that case, GM denied that any such design changes had been made that would affect the amount of torque it takes to move the key from Run to Accessory.

103.  Then, on April 29, 2013, the plaintiff's attorney took the deposition of the switch engineer. During that deposition, the plaintiff's attorney showed x-ray photographs of the ignition switch from the subject vehicle (the defective switch) and another switch from a later model year Cobalt. The photographs showed that the detent plunger in the early model was much shorter – and therefore would have had much lower torque performance – than the one in the later model year Cobalt. The engineer, confronted with these photographs, continued to deny knowledge of any change to the switch that would have accounted for this difference.

104.  But, as the design engineer later acknowledged, he knew almost immediately following his deposition that there had been a design change to the switch following production of the model year 2005 Cobalt, and that he must have been the engineer responsible for that design change, which was later confirmed by an outside expert retained by GM.

105.  GM's counsel in the Georgia crash case later urged GM to settle: "[T]here is little doubt that a jury here will find that the ignition switch used on [the Georgia crash car] was defective and unreasonably dangerous, and that it did not meet GM's own torque specifications. In addition, the [engineering inquiry documents about the defective switch from 2004 and 2005] and the on-going FPE investigation have enabled plaintiffs' counsel to develop record a from which he can compellingly argue that GM has known about this safety defect from the time

39

the first 2005 Cobalts rolled off the assembly line and essentially has done nothing to correct the problem for the last nine years." Facing punitive damages, GM agreed to pay $5 million. Notably, on October 7, 2010 and July 26, 2011, GM had previously been warned by outside counsel that it faced punitive damages exposure in other Cobalt airbag non-deployment cases.

106. Then, in late October 2013, GM received documentary confirmation from the switch supplier that the design engineer had indeed directed a part change in April 2006. This evidence further showed that the part was changed without a change to the corresponding part number. Only at this point did GM finally place the switch matter into the FPE process.

107. On November 7, 2013, GM personnel met with NHTSA to give a more in-depth presentation targeted at assuring NHTSA that GM was "responsive" and "customer focused" when it came to safety concerns. Although the presentation did not specifically address the switch and non-deployment problem – which has just entered the recall process and remained unknown to NHTSA – it did address concerns related to airbag non-deployment.

108. First, GM personnel showed NHTSA slides that touted the increasing swiftness with which GM had addressed safety defects from 2008 through 2012. One graph reflected that the average time taken from identification of the issue through recall was 160 days in 2008 and 84 days in 2012. It further showed that the

average time an issue remained in the "pre-FPE" stage was 105 days in 2008 and

33 days in 2012. The average number of days between entry into the FPE process

and the recall was 15 days in 2008 and 13 days in 2012. Other portions of GM's

presentation suggested that any airbag defect that presented with a failure to warn

the driver or certain other aggravating factors would be recalled swiftly.

109.  The defective switch matter entered the ISR on November 5, 2013,

after at least 804 days of formal investigation. Although GM told NHTSA that

recall would ordinarily occur about 13 days later, GM would not ultimately decide

to conduct a recall for the defective switch until January 31, 2014. Some within

GM expressed concern about how the "timeline" of GM's response to the problem

would look to NHTSA. Indeed, certain GM personnel knew by about the spring of

2012 that the defective switch posed a serious safety issue because it disabled

airbags in situations when they should have deployed. Yet, more than a year and a

half after that discovery, GM still had not conducted a recall.

110.  On January 31, 2014, the voting members of the EFADC agreed that a

recall of the affected cars was warranted. On February 7, 2014, GM announced the

recall to the public and NHTSA. Although other models—the Ion, most notably—

were likewise equipped with the switch, these were not recalled until February 24,

2014.

41

111.   The Company went on to issue at least 45 recalls in 2014, expanding well beyond the ignition switch problem to about 28 million vehicles in North America. This number is greater than the Company's combined U.S. sales for the years 2005-2013. Of total recalls in the U.S. market, approximately 13 million vehicles involved ignition switch issues. GM reported a $1.2 billion charge against earnings for the second quarter of 2014 to deal with this problem.

**j.    Summary of Allegations from the DPA.**

112.   As alleged herein, in September 2015, GM entered into the DPA with the U.S. Department of Justice in connection with the ignition switch defect and its consequences. In connection with the public announcement of the DPA, the government released the following release summarizing the facts to which GM had admitted:

> *Early Knowledge of the Defective Switch*
>
> GM engineers knew before the defective switch even went into production in 2002 that it was prone to easy movement out of the Run position.  Testing of a prototype showed that the torque return between the Run and Accessory positions fell below GM's own internal specifications.  But the engineer in charge of the defective switch approved its production anyway.
>
> In 2004 and 2005, as GM employees, media representatives and GM customers began to experience sudden stalls and engine shutoffs caused by the defective switch, GM considered fixing the problem.  However, having decided that the switch did not pose a safety concern, and citing cost and other factors, engineers responsible for decision-making on the issue opted to

leave the defective switch as it was and simply promulgate an advisory to dealerships with tips on how to minimize the risk of unexpected movement out of the Run position. GM even rejected a simple improvement to the head of the key that would have significantly reduced unexpected shutoffs at a price of less than a dollar a car.

At the same time, in June 2005, GM made public statements that, while acknowledging the existence of the defective switch, gave assurance that the defect did not pose a safety concern.

### *GM's Knowledge that the Defective Switch Causes Airbag Non-Deployment*

By the spring of 2012, GM knew that the defective switch presented a safety defect because it could cause airbag non-deployment in certain GM cars. Specifically, GM personnel investigating the cause of a series of airbag non-deployment incidents learned that the defective switch could cause frontal airbag non-deployment in at least some model years of the Cobalt, and were aware of several fatal incidents and serious injuries that occurred as a result of accidents in which the defective switch may have caused or contributed to airbag non-deployment. This knowledge extended well above the ranks of investigating engineers to certain supervisors and attorneys at the company.

### *GM's Failure to Disclose the Defect and Recall Affected Cars*

Yet not until approximately 20 months later, in February 2014, did GM first notify NHTSA and the public of the connection it had identified between the defective switch and airbag non-deployment incidents. The company thus egregiously disregarded NHTSA's five-day regulatory reporting requirement for safety defects.

Moreover, for much of the period during which GM failed to disclose this safety defect, it not only failed to correct its June 2005 assurance that the defective switch posed no safety concern but also actively touted the reliability and safety of cars

43

equipped with the defective switch, with a view to promoting sales of used GM cars. Although GM sold no new cars equipped with the defective switch during this period, GM dealers were still, from in or about the spring of 2012 through in or about the spring of 2013, selling pre-owned Chevrolet, Pontiac and Saturn brand cars that would later become subject to the February 2014 recalls. These sales were accompanied by certifications from GM, assuring the unwitting consumers that the vehicles' components, including their ignition systems and keys, met all safety standards.

GM's delay in disclosing the defect at issue was the product of actions by certain personnel responsible for shepherding safety defects through GM's internal recall process, who delayed the recall until GM could fully package, present, explain and handle the deadly problem. Rather than move swiftly and efficiently toward recall of at least the population of cars known to be affected by the safety defect and thus certainly destined for recall, GM personnel took affirmative steps to keep the company's internal investigation into airbag non-deployment caused by the defective switch "offline" – outside of GM's regular recall process.

Moreover, on at least two occasions while the defective switch condition was well known by some within GM but not disclosed to the public or NHTSA, GM personnel made incomplete and therefore misleading presentations to NHTSA assuring the regulator that GM would and did act promptly, effectively and in accordance with its formal recall policy to respond to safety problems – including airbag-related safety defects.

113.  In connection with the DPA, GM admitted that it "consents to the filing of a two-count Information (the 'Information') in the United States District Court for the Southern District of New York (the 'Court'), charging GM with engaging in a scheme to conceal a deadly safety defect from its U.S. regulator, in violation of Title 18, United States Code, Section 1343."

114. GM further stipulated to its "Acceptance of Responsibility." GM "admits that the facts set forth in the Statement of Facts attached as Exhibit C and incorporated herein are true and accurate. In sum, GM admits that it failed to disclose to its U.S. regulator and the public a potentially lethal safety defect that caused airbag non-deployment in certain GM model cars, and that GM further affirmatively misled consumers about the safety of GM cars afflicted by the defect."

115. GM entered into the DPA "under authority granted by its Board of Directors."

### III.    GM Admits Internal Control Failures and Fires Senior Personnel.

116. GM's admissions in February 2014 prompted a series of Congressional and private investigations into what went wrong at the Company. In April 1, 2014 testimony before the U.S. House Committee on Energy and Commerce, defendant Barra admitted on behalf of GM that moving shutdowns at highway speeds are indeed a safety issue. She also admitted that, for years, GM had been focused on containing and managing costs rather than safety or quality.

117. According to Barra, "there were points in time where one part of the organization had information that wasn't shared across to the other side of the organization. You can call it a silo . . . .  we've already made changes to the structure and to the responsibilities of people so that won't happen again." She further admitted

that GM testified that "we in the past had more of a cost culture and we are going to a customer culture that focuses on safety and quality."

118.  Following the February 2014 recall, NHTSA conducted an investigation into GM's handling of the ignition switch defect, which resulted in GM signing a Consent Order with NHTSA on May 16, 2014. NHTSA's investigation concluded that GM engineers, lawyers, investigators, and senior management responsible for reporting safety issues knew about the defect and its connection to airbag non-deployment for a long time prior to GM's decision to conduct the ignition switch recalls. In the Consent Order, GM "admit[ted] that it violated the Safety Act" and agreed to "pay the United States a maximum civil penalty" of $35 million for those violations.

119.  Soon, top engineering officials began to leave GM. On April 22, 2014, defendant Calabrese, GM's Global Engineering Chief, who had been with GM for more than 33 years and had been Vice President of Global Vehicle Engineering since April 2011, "elected to retire" as part of GM's restructuring in order to "address functional safety and compliance of its vehicles." On May 5, 2014, 56-year-old Jim Federico, GM's Chief Engineer of Global Company Cars, announced his sudden retirement from GM. Federico had been with GM for nearly 36 years.

120.  In a May 16, 2014 press release issued in connection with the NHTSA Consent Order, the NHTSA Acting Administrator summarized NHTSA's findings,

stating that "the evidence we found behind [GM's failure to report in a timely manner] was deeply disturbing," and concluding, *inter alia*, that GM had known about the ignition switch defect "for many years," and that "senior management received detailed briefings about this safety-related defect."

121.  In the Consent Order with NHTSA, GM also admitted to numerous internal control failures, including inadequacies in its processes for identifying safety defects and reporting those defects to NHTSA, and its processes for assessing the number of warranty claims relating to safety defects. GM further identified its failure to "conduct a safety recall because GM had not yet identified the precise cause of the defect" as yet another internal control failure.

122.  In particular, in the Consent Order GM admitted to serious inadequacies in its internal controls, including:

- GM's "ability to analyze data to identify potential safety-related defects" was inadequate;

- GM had failed to "encourag[e]" and needed to "improv[e]" information sharing across functional areas and disciplines";

- GM's recall decision-making process was inadequate, necessitating the need for GM to "increas[e] the speed with which recall decisions are made (including by clarifying the recall decision-

making process to decrease the number of steps prior to making the

final decision of whether to conduct a recall)";

- GM had failed to adequately communicate "with NHTSA

    regarding actual or potential safety-related defects"; and

- GM's "ability to identify safety consequences and the severity of

    those consequences, as well as to assess the number or rate of

    allegations, complaints, incidents, reports and/or warranty claims

    relating to potential safety-related defects" was "inadequate."

123.  The Valukas Report commissioned by the Board likewise addressed

GM's failed internal controls regarding the ignition switch defect. According to the

Valukas Report, "there were no timetables, no meetings scheduled, and no progress."

Rather, the "phenomenon of avoiding responsibility" was so institutionalized at GM

that employees knew it as "the 'GM salute,'" described as "a crossing of the arms and

pointing outward towards others, indicating that the responsibility belongs to someone

else, not me." As the NHTSA Acting Administrator had remarked, "GM's decision-

making, structure, process and corporate culture stood in the way of safety."

124.  The Valukas Report also noted the extensive history of accident litigation

involving affected vehicles, including the risk of punitive damages. It stated that "the

story of the Cobalt is one in which GM personnel failed to raise significant issues to

key decision-makers. Senior attorneys did not elevate the issue within the legal chain

of command to the General Counsel even after receiving [an] evaluation in the summer of 2013 that warned of the risk of punitive damages."

125.   On June 5, 2014, defendant Barra admitted that "we made serious mistakes in the past and as a result we're making significant changes in our company to ensure they never happen again."  During a "town hall" meeting on June 5, 2014, defendant Barra stated that "We are going to fix the failures in our system." On June 6, 2014, the Chairman of GM's Board, Theodore Solso, stated that "The Board, like management, is committed to changing the company's culture and processes to ensure that the problems described in the Valukas report never happen again."

126.   During defendant Barra's testimony before the U.S. House Committee of Energy and Commerce on June 18, 2014, Senator Ron Johnson questioned whether problems arising from the ignition switch defect were included in risk and compliance shareholder disclosure reports mandated by the SEC, asking Barra "How does it break down that bad in a company that is, you know, publicly traded?" Barra admitted that "it is unacceptable the way things broke down, and that is why we have made dramatic process changes." Barra further admitted that the Valukas Report "paints a picture of an organization that failed to handle a complex safety issue in a responsible way . . . There is no way to minimize the seriousness of what Mr. Valukas and his investigations uncovered." Barra further admitted that "deep underlying cultural problems [were] uncovered in this report."

49

127.  On July 17, 2014, during a hearing before the U.S. Senate Consumer Protection Subcommittee in which the Valukas Report was discussed, defendant Barra conceded that "I will use the report's findings and recommendations to attack and remove information silos wherever we find them and to create an organization that is accountable and focused on the customer."

128.  GM subsequently fired or terminated a large group of employees, including, legal, safety and investigative personnel. On July 17, 2014, defendant Barra stated: "We removed fifteen employees from the company… some for misconduct or incompetence, others because they didn't take responsibility or act with a sense of urgency." Barra told reporters that most of the individuals were in "senior or executive roles" and "reached the highest levels of the company."

129.  It was reported that the terminated individuals included Ray DeGiorgio, the design engineer; Gary Altman, Chief Development Engineer; Ron Porter and Jaclyn Palmer, product litigation attorneys; Jennifer Sevigny, an attorney who led GM's field product assessment group; William Kemp, Counsel for Global Engineering Organization, GM's top safety lawyer; Lawrence Buonomo, Practice Area Manager, Global Process & Litigation; Michael Robinson, Vice President of Sustainability and Global Regulatory Affairs and the former North American general counsel; Gay Kent, General Director of Safety and Vehicle Crashworthiness; Carmen Benavides, Director

of Product Investigations; and Maureen Foley-Gardener, Director of Field Performance.

130.  GM's profuse admissions and apologies continued unabated in 2014. Defendant Akerson admitted on July 28, 2014 that "I think we all – including the new and the old part of the management team – didn't fully realize how deep some of the problems ran." Remarkably, on September 8, 2014, GM's Chairman Theodore Solso admitted that "Yes, we should have known earlier. The way I look at it, **G.M. has not been well run for a long time**."

131.  On October 1, 2014 during a conference call with investors, defendant Barra further admitted that the Company controls were defective, stating: "[W]hen I think about how do I start changing a culture, creating the ultimate culture that we want, it starts today with the behaviors that we demonstrate. And we've been very clear with our leadership team and as we've rolled out the core values to every employee, **that we need to change behaviors, and that includes me**."

132.  A GM spokesperson also admitted on November 11, 2014, that "our system needed reform, and we have done so. We have reorganized our entire safety investigation and decision process." CFO Tom Ammann admitted on November 11, 2014 that "It [the ignition switch recall] reinforced the need for ongoing change. We needed to break down our internal silos, integrate and require transparency across the business so that everyone is sharing information."

51

133.  Finally, defendant Barra admitted on January 8, 2015 concerning GM's internal controls and the ignition switch recalls that "It was clearly a tragedy, and it was deeply troubling. But we quickly acknowledged our shortcomings and set about addressing them."

### IV.   The Individual Defendants Breached Their Fiduciary Duties.

#### a.   Barra.

134.  During relevant times, Barra served in three senior officer positions with GM: Senior Vice President, Global Product Development; Executive Vice President, Global Product Development, Purchasing & Supply Chain; and CEO. As alleged herein, in the first two positions Barra was identified as GM's "Product Chief" and in that role Barra was responsible for the design, engineering, program management and quality of GM vehicles around the world.

135.  To discharge her duties as an officer in these senior positions, Barra was required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of GM's business affairs. By virtue of such duties, Barra was required to, among other things: establish corporate governance and reporting structures effective to inform herself about the occurrence of safety-related product defects; conduct the affairs of GM in an efficient manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets,

and to maximize the value of the Company's stock; and remain informed as to how GM conducted its operations, and, upon receipt of notice of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take proactive steps to correct such conditions or practices.

136.   While GM has acted against employees allegedly responsible for events related to the ignition switch defect and recall, defendant Barra largely escaped scrutiny and was even promoted to CEO, even though she received early emails regarding GM recalls raising technical issues very similar to those plaguing vehicles equipped with the defective ignition switches.

137.   On October 3, 2011, after Barra had become Senior Vice President for Global Product Development, the then-Vice President for Global Quality sent her an email with a press report disclosing that NHTSA was investigating Saturns for power steering problems.

138.   This email informed Barra that "the National Highway Traffic Safety Administration is a step closer to concluding that General Motors should have recalled 384,000 Saturn Ions in 2010 as part of a larger recall that covered one million Chevrolets and Pontiacs for a steering problem. The agency posted a document on its Web site over the weekend at the time saying that it upgraded its investigation into Saturn Ions from the 2004-7 model years as a result of heightened concern that a sudden loss of electric power steering could cause crashes. The document shows the

agency has 846 complaints from Saturn owners and G.M. has almost 3,500."
[emphasis supplied].

139.  In addition, on April 22, 2012, Barra received an email from a former GM employee reporting the existence of the "moving stall" with a Buick directly attributable to key design and suggesting that the Company investigate and perhaps issue a service bulletin. Barra forwarded the email to the VP for Global Quality. Her email was then forwarded to others within GM and an email discussion ensued ultimately involving eight people, but no longer including Barra.

140.  The Valukas Report further notes that in December 2013, Barra was provided with information that data was being reviewed that could lead to a recall in connection with the defective ignition switch. The recall was not announced until February 7, 2014, a substantial delay which formed a basis for NHTSA's determination that GM failed to timely report the safety defect.

141.  Furthermore, as *The New York Times* reported on November 10, 2014, GM placed an urgent order with Delphi, its ignition switch supplier, for 500,000 replacement switches on December 18, 2013. Specifically, on December 18, 2013, almost two months before GM first publicly announced in February 2014 that it was recalling Cobalts and Pontiac G5s due to the defective ignition switches, GM internally placed an "urgent" parts order with Delphi for 500,000 ignition switches that would be

used as the replacements in the eventual recalls. At this time, Barra was still serving as Executive Vice President, Global Product Development, Purchasing & Supply Chain.

142.   Notwithstanding these matters which provided actual or constructive notice to defendant Barra, she failed to act responsibly. In this regard, Barra stated once the ignition switch problems *were* finally revealed "that we need to change behaviors, ***and that includes me*."

143.   As alleged herein, defendant Barra was sued for securities fraud in the Securities Class Action, in which the plaintiffs alleged that certain GM defendants, including Barra, made false and misleading statements to purchasers of GM stock, with intent to defraud them. GM settled these claims for $300 million rather than even await a decision on its pending motion to dismiss.

144.   As alleged herein, on January 31, 2014, the EFADC officially determined to issue the first recall. Barra admitted that she knew of the ignition switch defect by this date. These facts support a strong inference that Barra knew about GM's decision to conduct the ignition switch recall by January 31, 2014, yet just days later certified in GM's Form 10-K filing for 2013 filed with the SEC that the Company maintained, in all material respects, effective internal controls.

145.   As "Product Chief" and then CEO of GM, defendant Barra knew that the Company's internal controls regarding safety and regulatory compliance were critical to GM's continuing operations as a car manufacturer. As such, Barra knew or

recklessly failed to learn that GM lacked sufficient internal controls to ensure that product defects raising consumer safety issues would be (a) elevated to senior management so that prompt action could be taken; and (b) properly communicated to GM's regulators to ensure consumer safety and legal compliance. Nevertheless, Barra knowingly, recklessly or with gross negligence failed to timely remediate these failing internal controls.

###    b.    Akerson.

146.    During relevant times, Akerson was CEO of GM. By reason of his position as an officer of GM, Akerson owed GM and its shareholders fiduciary duties of care and loyalty in the management and administration of GM's affairs, as well as in the use and preservation of GM's property and assets. To discharge his duties, Akerson was required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of GM's business affairs.

147.    Akerson was required to, among other things: monitor and oversee a system of internal controls sufficient to ensure that GM's products were safe; ensure that the Company timely and accurately informed customers and regulators regarding safety problems; establish corporate governance and reporting structures effective to inform himself about the occurrence of safety-related product defects; conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest

56

quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; remain informed as to how GM conducted its operations; and, upon receipt of notice of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith and take proactive steps to correct such conditions or practices.

148.  Defendant Akerson was the CEO of GM from 2010 through late 2013. Akerson abruptly left GM in December of 2013. Once the ignition switch scandal was revealed in February 2014, Akerson admitted that GM's internal controls, for which he had been responsible as CEO, were ineffective during his tenure. As reported by *The Detroit News* on July 28, 2014, Akerson admitted "I think we all – including the new and the old part of the management team – ***didn't fully realize how deep some of the problems ran***." These systemic failures were directly Akerson's responsibility as CEO. Furthermore, Akerson's stark admission contradicts his repeated certifications in GM's SEC filings that the Company's internal controls were adequate when they were not.

149.  In this regard, the suspicious timing of Akerson's "retirement" from GM in late 2013, shortly before the recalls began, and his stated intent to spend time with his family (even while taking on the position of Vice Chairman of The Carlyle Group, a large asset management firm) raise serious questions regarding whether Akerson fulfilled his fiduciary duties as CEO.

57

150.  For example, on April 8, 2014, *Forbes* reported that John McElroy, an authority on the automotive industry, asked whether Akerson's abrupt departure indicated that he knew by late 2013 "about the coming cataclysmic recall." McElroy asked: "So [Akerson] doesn't have time to be chairman of General Motors, but he does have time to be vice chairman of Carlyle?" Akerson also joined Lockheed Martin as a director in early 2014, less than two months after leaving GM.

151.  Defendant Akerson's departure from the Company also coincided perfectly with GM's unusual "urgent" parts order with its ignition switch supplier, Delphi, for 500,000 ignition switches that would be used as the replacements in the eventual recalls.

152.  In addition, as alleged herein, defendant Akerson was sued for securities fraud in the Securities Class Action, in which the plaintiffs allege that certain GM defendants, including Akerson, made false and misleading statements to purchasers of GM stock, with intent to defraud them. GM settled these claims for $300 million rather than await a decision on its pending motion to dismiss.

153.  As CEO of GM, defendant Akerson knew that the Company's internal controls regarding safety and regulatory compliance were critical to GM's continuing operations as a car manufacturer. As such, Akerson knew or recklessly failed to learn that GM lacked sufficient internal controls to ensure that product defects raising consumer safety issues would be (a) elevated to senior management so that prompt

action could be taken; and (b) properly communicated to GM's regulators to ensure consumer safety and legal compliance. Akerson knowingly, recklessly or with gross negligence failed to timely remediate these internal controls.

### c.    Millikin.

154.   During relevant times, Millikin served as a Senior Vice President and General Counsel of GM. To discharge his duties as an officer, Millikin was required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of GM's business affairs.

155.   By virtue of such duties, Millikin was required to, among other things: ensure that the Company timely and accurately informed customers and regulators regarding safety problems; establish corporate governance and reporting structures effective to inform himself about the occurrence of safety-related product defects; conduct the affairs of GM in an efficient manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and remain informed as to how GM conducted its operations, and, upon receipt of notice of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take proactive steps to correct such conditions or practices.

156.   Defendant Millikin became General Counsel of the Company in 2009. On October 17, 2014, GM announced that defendant Millikin had informed the Company of his decision to retire in early 2015 after more than 40 years at GM. As alleged herein, Millikin has admitted that the legal department of GM, for which he was directly responsible, failed to work properly.

157.   At GM, Millikin headed a legal department consisting of a team of attorneys, including those who assisted in the defense of personal injury litigation. As alleged herein, by virtue of such litigation, several attorneys were put on notice of the role of the ignition switch defect in vehicle crashes, but failed to elevate the issue. During a July 17, 2014 Senate hearing, defendant Millikin admitted that ***"We had lawyers at GM who didn't do their jobs; didn't do what was expected of them."*** According to defendant Millikin, "those lawyers are no longer with the company" and "[a]s general counsel, ***I am ultimately responsible for the legal affairs of the company***."

158.   During the July 17, 2014 hearing, Senator Richard Blumenthal stated that "In this instance, the lawyers enabled purposeful concealment and cover-up, possible criminal action that is the subject right now of an investigation."

159.   As alleged herein, the legal department had been on notice for years of serious accidents and related personal injury litigation which could be traced to stalled vehicles. As Senator Claire McCaskill put it: "the failure of this legal department is

60

stunning." A *Forbes* article dated July 20, 2014 and entitled "Barra is protecting GM

Top Lawyer – But Should She Be?" reported:

> GM's earlier report on its internal investigation said that
> members of Millikin's staff were warned repeatedly starting in
> 2010 that GM could face big punitive-damage awards over its
> failure to address the defect adequately, but it said that the
> amounts of the settlements involved were too low to require
> Millikin's review.
>
> But Sen. Claire McCaskill (D., Mo.) was among panel members
> who were incredulous that Millikin wasn't blamed anyway.
> "How in the world, in the aftermath of this report, did Michael
> Millikin keep his job?" she asked. "This is either gross
> negligence or gross incompetence on the part of the lawyer, the
> notion that he can say, 'I didn't know.'"
>
> And Sen. Dean Heller (R., Nev.) told the Wall Street Journal: "I
> was surprised at the bear hug that [Barra] gave Millikin in that
> hearing. Even if he didn't know, he had an obligation to know.

160.   Indeed, the Valukas Report confirms that GM's lawyers did not have a

uniform policy in place for elevating safety issues in connection with the

aforementioned "Roundtable" process:

> The main function of the Roundtable was to generate better
> claim evaluations and settlement forecasts through a "peer
> review" structure. But a number of GM lawyers reported that it
> had a second function as well: to spot trends indicating safety
> issues. Product litigation attorney Ron Porter stated that it was
> well recognized that a goal of the Roundtable and SRC process
> was to identify potential safety issues and refer them to
> engineers. His product litigation colleague Jaclyn Palmer said
> that attorneys discussed potential product safety or accident
> trends at Roundtables on occasion, and the Roundtable
> Committee referred issues to GM engineers for a follow-up
> investigation. Not all GM lawyers, however, agreed with this

view. Buonomo, for example, said that it was not the Roundtable's function to spot trends and that if a lawyer had to flag a trend, then the system had already failed. To put this issue in a specific context, at a Roundtable discussion on the Cobalt airbag non-deployment issue in 2012, a junior lawyer recalled asking whether there should be a recall. He was told that the issue had already been raised with engineering, that the engineers were working on it, and that they had not come up with a solution. This lawyer got the "vibe" that the lawyers had "done everything we can do." **We have discovered no formal written policies governing how the settlement committees should handle safety issues**. [emphasis supplied].

161.  These "formal written policies" were the responsibility of Millikin. Millikin's legal department was put on notice of injuries and even deaths related to the ignition switch failure as early as 2010, yet Millikin failed to ensure that matters of such a serious nature would be brought to his attention as the General Counsel, or to the attention of senior management.

162.  Indeed, according to the Valukas Report, "senior attorneys did not elevate the issue within the Legal chain of command to the General Counsel - even after receiving the evaluation in the summer of 2013 that warned of the risk of punitive damages because of a 'compelling[]' argument that GM had 'essentially done nothing to correct the problem for the last nine years.'"

163.  Furthermore, according to the Valukas Report, GM employees were instructed to write "smart" and not to use "judgmental adjectives and speculation"

regarding issues which might help a plaintiff lawyer's case. Furthermore, according to the Valukas Report:

> In addition to being trained on how to write, a number of GM employees reported that they did not take notes at all at critical safety meetings because they believed GM lawyers did not want such notes taken. No witness was able to identify a lawyer who gave such an instruction, no lawyer reported having given such an instruction, and we have found no documents or emails reflecting such an instruction. The no-notes direction, however, reached the status of an urban myth that was followed, an instruction passed from GM employee to GM employee over the years. Thus, as we learned in our investigation, for many meetings – of GM's many committees - there are no clear records of attendance or of what was discussed or decided.

164.  While Millikin was permitted to "retire" from GM in 2015, up to five GM attorneys on his staff were terminated.

165.   As General Counsel of GM, defendant Millikin knew that the Company's internal controls regarding legal, safety and regulatory compliance were critical to GM's continuing operations as a car manufacturer. As such, Millikin knew or recklessly failed to learn that GM lacked sufficient internal controls to ensure that product defects raising consumer safety issues would be (a) elevated to senior management so that prompt action could be taken; and (b) properly communicated to GM's regulators to ensure consumer safety and legal compliance. Millikin knowingly, recklessly or with gross negligence failed to timely remediate these internal controls.

**d.      Calabrese.**

166.   During relevant times, Calabrese was Vice President Global Vehicle Engineering, identified in the Valukas Report as GM's "Chief Engineer." By reason of his position as an officer of GM, Calabrese owed the Company and its shareholders fiduciary duties of care and loyalty in the management and administration of GM's affairs, as well as in the use and preservation of GM's property and assets.

167.   By virtue of such duties, Calabrese was required to, among other things: establish corporate governance and reporting structures effective to inform himself about the occurrence of safety-related product defects; conduct the affairs of GM in an efficient manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; to remain informed as to how GM conducted its operations; and, upon receipt of notice of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith and take proactive steps to correct such conditions or practices.

168.   Calabrese's retirement from GM in 2014 was announced as part of GM's restructuring to "address functional safety and compliance of its vehicles."

169.   Calabrese knew about the ignition switch defect well before the February 2014 recall. In early 2013, Calabrese was asked to appoint a replacement "Executive Champion" for the ongoing ignition switch investigation, which, according to the

DPA, had already established a connection between the ignition switch and airbag non-deployment in the Cobalt.

170.  Calabrese was on notice of GM's failing safety and recall practices. On July 23, 2013, Frank Borris from NHTSA's Office of Defects Investigation sent an email to Carmen Benavides, GM Director of Product Investigations, Safety Regulations, Field Performance Assessment, and TREAD, about an upcoming July 25, 2013 meeting between GM and NHTSA. Borris provided Benavides with a list of issues he wished to discuss with GM concerning GM's delays to take action on safety issues, and wrote that "[t]he general perception is that GM is slow to communicate, slow to act, and, at times, requires additional effort of ODI that we do not feel is necessary with some of your peers." Borris added that "there is a general perception in ODI that GM is one of, if not the worst offender of the regional recall policy." Benvenides immediately forwarded this email to Calabrese.

171.  Furthermore, according to the Valukas Report, Calabrese was part of the EFADC (the committee at GM responsible for approving recalls) in late 2013 that did not vote to recall affected vehicles until January 31, 2014, even after it had already learned that the defect had caused fatalities.

172.  According to the Valukas Report:

> When asked why he did not support an immediate recall given the fact that fatalities had occurred, Calabrese explained that, at this point, he did not see a reason to rush to a recall because the

backup slides to the EFADC materials showed a strong downward trend in the occurrence of airbag non-deployments and he wanted the investigation to be done correctly so that the solution arrived at would actually fix the problem.

173. Notably, GM identified its failure to "conduct a safety recall because GM had not yet identified the precise cause of the defect" as an internal control failure in the NHTSA Consent Order.

174. As an officer and the Chief Engineer of GM, defendant Calabrese knew about the ignition switch but failed to immediately inform his superiors, in breach of his fiduciary duties.

175. In addition, Calabrese knew that the Company's internal controls regarding safety defect detection and disclosure were critical to GM's continuing operations as a car manufacturer. As such, Calabrese knew or should have known that GM lacked sufficient internal controls to ensure that product defects were (a) elevated to senior management so that prompt action could be taken; and (b) properly communicated to GM's regulators to ensure consumer safety and compliance. Calabrese knowingly, recklessly or with gross negligence failed to timely remediate these internal controls.

## V.   False Statements to Shareholders from 2011 through 2014.

176. In light of the problems with the ignition switch and the internal control breakdown alleged herein, it is apparent that multiple GM SEC filings between 2011

66

and 2014 contained false and misleading statements, as alleged in the Securities Class Action.

177. In this regard, the Company's SEC filings from 2011 and 2014 were false and misleading because the costs of GM's product warranty and recall campaigns for defective vehicles, as well as the costs of claims against the Company that GM incurred, or reasonably expected to incur, as a result of the Company's manufacture and sale of the defective vehicles (including those costs eventually paid for once the ignition switch defect was fully exposed) were materially understated.

178. As a result of GM not issuing any safety recall during this period, GM understated, and failed to disclose, the Company's true liabilities, costs and contingencies because GM knew or recklessly disregarded that safety problems existed in connection with the defective ignition switch.

179. In addition, the Company's SEC filings during this period were false and misleading to the extent they represented that the Company was committed to safety, a common refrain throughout the Company's public filings from 2011 through 2014, as alleged herein. As alleged herein, GM admitted that, during this time, it was more focused on cost containment, not safety.

180. Akerson signed GM's Forms 10-K for the years ended December 31, 2010, December 31, 2011, and December 31, 2012; GM's Annual Reports dated March 1, 2011, February 27, 2012, and April 25, 2013; and certifications in GM's

Forms 10-K and 10-Q filed with the SEC on March 1, 2011, May 6, 2011, August 5, 2011, November 9, 2011, February 27, 2012, May 3, 2012, August 3, 2012, October 31, 2012, February 15, 2013, May 2, 2013, July 25, 2013 and October 30, 2013.

181. Barra signed GM's Form 10-K for the year ended December 31, 2013, along with the certification attesting to the Company's internal controls in GM's Form 10-K filed with the SEC on February 6, 2014. Remarkably, while Barra attested to the adequacy of the internal controls, just one day after the Form 10-K was filed GM's internal control failures became apparent with the recall.

## DERIVATIVE AND DEMAND REFUSAL ALLEGATIONS

182. Plaintiff brings this action on behalf of GM to redress injuries suffered, and to be suffered, by GM as a direct result of violations of the breaches of fiduciary duty alleged herein. GM is named as a nominal defendant solely in a derivative capacity.

183. Plaintiff will adequately and fairly represent the interests of GM in enforcing and prosecuting its rights and has hired counsel experienced in shareholder litigation. Plaintiff was a shareholder of GM at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current GM shareholder.

184. By letter dated April 30, 2015 plaintiff made a demand on the Board to investigate and pursue legal remedies against all wrongdoers with responsibility for the

ignition switch disaster and the related fallout. See Exhibit A. By letter dated June 24, 2015, GM's in-house counsel advised that the Board had determined to defer consideration of the demand "until the Court rule[d]" on a pending motion to dismiss in the factually similar action *In re General Motors Derivative Litigation*, No. C.A.9627-VCG, pending in the Delaware Chancery Court. See Exhibit B. In that case, the plaintiffs alleged that a shareholder demand like the one made by plaintiff in this action was excused for futility.

185.  By order dated June 26, 2015, the Delaware Chancery Court granted the motion to dismiss, and held that demand futility had not been alleged with sufficient particularity, such that demand was not excused. At this time, the Board became obligated to act immediately on plaintiff's demand. Plaintiff therefore wrote to the Board on July 27, 2015 demanding immediate action. See Exhibit C. However, by letter to plaintiff dated September 15, 2015, the Board stated that it would *again* defer consideration of the demand because the Delaware plaintiffs had filed an appeal and the Board would await "disposition" of the appeal before taking any action. See Exhibit D. Meanwhile, as alleged herein, GM continued to incur billions of dollars in penalties, settlements, and exposure due to the egregious wrongdoing of the defendants and others.

186.  It is apparent that, from the outset, the Board was motivated by delay and obstruction. For the reasons alleged herein, in light of the scope of the ignition switch

episode, the Board's conduct in delaying consideration of the demand was itself unreasonable and in bad faith. Notwithstanding the severity of the ignition switch scandal, which had already resulted in billions of dollars in liabilities, the departure of substantial number of senior management personnel, a raft of private consumer and injury litigation, and a DPA after a criminal investigation, no action was taken.

187.   The Board's delay was wrongful. In particular, the Board's letters to plaintiff confirm that it: (a) failed to promptly hire independent counsel to actually *investigate* possible claims before deciding to put off consideration of them indefinitely; (b) failed to promptly commission or produce a written report in response to the demand detailing any process, reasoning and/or conclusions; and (c) failed to promptly document any evaluation of claims, defenses and remedies. Not surprisingly, based on this hopelessly flawed process, the Board concluded that it would do nothing indefinitely.

188.   By letter dated March 4, 2016, almost a full year after plaintiff made his demand, the Board advised plaintiff that the Delaware appeal had concluded, and that it would finally "proceed to consider" whether it was in GM's best interests to "pursue the claims that your client seeks to assert derivatively in the complaint." See Exhibit E. By letter dated June 14, 2016, the Board refused the demand. See Exhibit F (the "Refusal Letter"). The Board's refusal was wholly improper. As alleged below, the

Board failed to ensure that the demand was reviewed by an independent committee of disinterested directors, and its investigation was neither reasonable nor in good faith.

189. <u>First</u>, the Board failed to appoint an independent committee of disinterested directors to act on the demand. At the time the Board took up the demand in March of 2016, it consisted of (a) legacy directors Barra, Michael Mullen, James Mulva, Patricia Russo, Thomas Schoewe, Theodore Solso, Kathryn Marinello, and Carol Stephenson, each of whom served while the misconduct occurred, and (b) newly-appointed directors Joseph Ashton, Linda Gooden, and Joseph Jimenez, each of whom joined the Board after the misconduct was revealed. At the very least, the legacy directors failed to detect or halt the criminal conduct GM admitted to in the DPA, and were therefore personally interested in the subject matter of plaintiff's demand. In addition, as of March 2016, the legacy directors were still named defendants in the action *In re General Motors Company Shareholder Derivative Litigation*, No. 2:14-cv-11277 (E.D. Mich.), in which they were defending claims for breach of fiduciary duty arising out of the *same facts* at issue in the demand. A majority of the March 2016 Board was therefore personally conflicted. Under these circumstances, it was incumbent on the Board to appoint an independent committee of some or all of the newly appointed directors to act on GM's behalf. At a minimum, legacy directors Mullen, Mulva, Russo, Schoewe, Solso, Marinello, and Stephenson – who are

71

personally conflicted due to their service on the Board during the admitted misconduct – should have, like Barra, been recused from considering the Carro demand.

190.   Second, the Refusal Letter wholly fails to reconcile GM's admission of criminal conduct in the DPA with the failure of the Board to hold even one director, officer or executive accountable for breach of fiduciary duty or other violation. The Refusal Letter's failure to identify actionable wrongdoing by any GM director, officer or executive notwithstanding GM's "acceptance of responsibility" is directly contrary to GM's admission in the DPA of criminal conduct and its payment of a $900 million forfeiture, and in total disregard of the incriminating DPA and its massive related liability. Likewise, the Refusal Letter's conclusion that there was no actionable wrongdoing by any GM director, officer or executive is directly contrary to GM's agreement to pay $300 million to quickly settle allegations that GM and its reporting officers committed securities fraud from 2011 through 2014 – a highly unusual settlement reached before their motion to dismiss was even resolved. Finally, the Refusal Letter's summary conclusion that there was no actionable wrongdoing by any GM director, officer or executive is directly contrary to defendant Barra's 2014 statements that, after the scandal was revealed, GM terminated numerous individuals in "senior or executive roles" or who "reached the highest levels of the company." None of these individuals are held accountable, and no explanation is provided.

191.  <u>Third</u>, the Refusal Letter reveals that the scope of the investigation was fatally flawed. The Refusal Letter concludes that "there were no viable claims to be brought against the four GM officers named in the Carro Action – Marry Barra, Daniel Akerson, Michael Millikin, and John Calabrese." <u>See</u> Refusal Letter, page 2. However, in the April 30, 2015 demand letter, plaintiff demanded that the Board investigate and pursue claims against <u>any and all</u> responsible directors, officers and executives, not just the named defendants. <u>See</u> Exhibit A, page 5. There was no basis for the Board to limit the scope of the investigation or findings to Barra, Akerson, Millikin and Calabrese, particularly in light of the admissions of criminal wrongdoing in the DPA and the $300 million Securities Class Action settlement. For example, in response to the Carro demand, the Board did not address or evaluate possible claims against Nicholas Cyprus, Christopher Liddell, Daniel Amman, Charles K. Stevens, III, Thomas Timko or Gay Kent, each of whom were named as defendants in the costly Securities Class Action. In contrast, while the Board's investigation and findings were inexplicably limited to just Barra, Akerson, Millikin and Calabrese, the Board *did* see fit to absolve itself and all other outside directors who have served on the GM Board since 2009, even though none of them are sued in this action. <u>See</u> Refusal Letter, page 5. The omission of even an inquiry regarding any other officers or executives is telling and demonstrates a failed and unreasonable process.

73

192.  Fourth, glaringly absent from the Refusal Letter's list of interviewees is a single adverse party, regulator, or representative of the U.S. Department of Justice, NHTSA, or SEC which were all conducting ongoing investigations of GM related to the ignition defect fiasco – and each of which was noted in Carro's demand letter. Nor did the Board consult with persons involved in the two Congressional investigations or plaintiffs' attorneys involved in the litany of product liability, personal injury and consumer class actions (which were similarly described in Carro's letter). For instance, as set forth in the September 17, 2015 release announcing "criminal charges" against GM, that investigation was conducted by "Loretta E. Lynch, the Attorney General of the United States, Anthony Foxx, the United States Secretary of Transportation, Preet Bharara, the United States Attorney for the Southern District of New York, Mark R. Rosekind, Administrator of the National Highway Traffic Safety Administration, Calvin L. Scovel, III, Inspector General of the United States Department of Transportation Christy Goldsmith Romero, Special Inspector General of the Office of the Special Inspector General for the Troubled Asset Relief Program, and Diego Rodriguez, the Assistant Director-in-Charge of the New York Field Office of the Federal Bureau of Investigation." Yet, according to what is described in the Refusal Letter, the Board failed to contact any of these individuals, regulators, authorities, or any other adverse party. Instead, the Board relied on inherently less probative (and likely exculpatory) statements of current or former GM personnel and representatives.

74

Given the scope of the ignition switch disaster, the omission of interviews of adverse parties or regulators from the investigation process is inexplicable and undermines the integrity of any conclusions reached by the Board.

193.   Fifth, the Refusal Letter fails to demonstrate that the Board assessed the independence of Wachtell Lipton Rosen & Katz ("Wachtell Lipton"), its chosen counsel to investigate the demand. To the contrary, Wachtell Lipton has a broader preexisting relationship with GM and/or the Board. According to the Refusal Letter, the Board retained Wachtell Lipton "in early 2014 to advise it concerning matters related to the recalls" – not specifically to provide independent advice regarding a shareholder demand to assert claims *against* GM's directors, officers, or executives. In light of this disclosure, the Refusal Letter's failure to elaborate on the extent of relationship between GM and Wachtell Lipton (and how much Wachtell Lipton has been or will be paid for its other GM engagements) is highly suspect and raises more than a reasonable doubt regarding Wachtell Lipton's independence.

194.   Furthermore, GM's retention of Wachtell Lipton to advise and assist the Company with other large-scale financial transactions casts more than a reasonable doubt on whether the law firm is capable of rendering independent legal advice regarding the Carro demand. For instance, the GM Board previously hired Wachtell Lipton to represent it in connection with the Company's recent multi-billion dollar repurchase of its common stock from the United States Treasury following its

75

emergence from bankruptcy. Any Wachtell Lipton recommendation that the Company should bring suit against its current executives or directors – as Carro demands in his letter – would plainly endanger the law firm's prospects for future engagements from GM. The Refusal Letter is silent on this conflict of interest, supporting the reasonable inference that the Board's investigation was unreasonable and that its decision-making process was inherently flawed and not undertaken in good faith.

195.  The Refusal Letter also fails to address whether Wachtell Lipton has ever represented any current or former Board member in their individual capacity, or represented any entity of significance to any Board member, or in which he or she is a control person. Likewise, it fails to disclose information regarding whether Wachtell Lipton is precluded from accepting future engagements from GM or the Board.

196.  Specifically, the dearth of information discussing the conflicts of interest arising out of Wachtell Lipton's relationship with defendant Akerson is startling. Before joining GM, Akerson was a Managing Director of The Carlyle Group, a global asset manager firm with over $189 billion of assets under management. Akerson also served as that firm's Head of Global Buyout from July 2009 to August 2010 and Co-Head of U.S. Buyout from June 2003 to June 2009. The Carlyle Group quickly welcomed Akerson back after he abruptly departed GM under the suspicious circumstances alleged herein, when he rejoined the firm as Vice Chairman and Special Advisor to the Board of Directors in March 2014. Throughout this period, The Carlyle

76

Group regularly hired Wachtell Lipton to advise and represent the asset management firm in its large-scale merger and acquisition (M&A) transactions, including at least: (a) a $22 billion buyout of Kinder Morgan; (b) a $665.5 million acquisition of Duff & Phelps; (c) the majority stake acquisition in Confer Financial Services (financial terms not disclosed); (d) the acquisition of DBRS Holdings Limited (financial terms not disclosed); and (e) the majority stake acquisition of EPIC Insurance (financial terms not disclosed). Any recommendation by Wachtell Lipton that the Company should bring suit against Akerson – as Carro demands in his letter – would obviously endanger the law firm's extremely lucrative retention opportunities with The Carlyle Group. As reported by the *New York Times* in January 2015, Wachtell Lipton traditionally gets paid several hundred thousand dollars up front for M&A deals such as those described above, while also receiving a percentage of the resulting transaction (typically ranging from at least 1% for deals under $250 million to 0.1% or less for deals over $25 billion). *See* https://dealbook.nytimes.com/2015/01/09/a-peek-into-how-wachtell-bills-for-deals/?_r=0 (Jan. 9, 2015). Again, the Refusal Letter is silent on this conflict of interest and Wachtell Lipton's lack of independence, further supporting the reasonable inference that the Board's investigation was unreasonable or that its decision-making process was not undertaken in good faith.

197.  In light of the foregoing relationships, the Refusal Letter's failure to explicitly vouch for Wachtell Lipton's independence from GM and the targets of

Board's investigation is very revealing and undermines the integrity of the Board's process and its conclusions.

198.   Sixth, with respect to defendants Barra, Akerson, Milliken and Calabrese, the Refusal Letter fails to address plaintiff's particularized allegations of their alleged misconduct. Instead, the Refusal Letter states in conclusory fashion that these defendants "did not learn" of the ignition switch defect until "late 2013" or later, did not "in any way" respond to it "in a manner that might give rise to a viable claim" and that each "maintained appropriate and reasonable processes and procedures" and had "no reason" to suspect these procedures were "ineffective on any particular issue at the time." As alleged herein, the Refusal Letter fails to reconcile these conclusions with GM's admission of criminal conduct on the watch of these defendants, or to address defendant Barra's admissions that GM needed to "change its behaviors," that it was "unacceptable the way things broke down," and that "something went wrong with our process in this instance and terrible things happened."

199.   Furthermore, with respect to Barra and Akerson, the Refusal Letter fails to reconcile its finding of no viable claims against any individual with the Company's decision to quickly settle the Securities Class Action claims against Barra, Akerson and others for $300 million. With respect to Millikin, the Refusal Letter fails to reconcile that Millikin's legal department was put on notice of injuries and even deaths related to the ignition switch failure as early as 2010, yet did nothing. With respect to

Calabrese, the Refusal Letter fails to reconcile that in early 2013, Calabrese was asked to appoint a replacement "Executive Champion" for the ongoing ignition switch investigation, which, according to the DPA, *had already established* a connection between the ignition switch and airbag non-deployment in the Cobalt.

200.  Seventh, the Refusal Letter speculates in boilerplate language that the "costs," "distraction" and "effect on morale" of pursuing the asserted claims were factors in the Board's decision not to pursue the claims, without quantifying any of these purported risks, or taking into account the significant cash recovery and governance reforms that would benefit the Company through a successful prosecution. The Refusal Letter speculates that the prospect of "any meaningful recovery" from the defendants was "small" while failing to document whether any investigation was conducted into the defendants' assets. The Refusal Letter speculates that by pursuing claims the Company would risk its access to "D&O coverage in the future" or "make it virtually impossible" to "retain and recruit qualified directors" without disclosing any backup for these highly questionable contentions. In sum, the Refusal Letter fails to explain how these speculative risks could outweigh the pursuit of billions of dollars in corporate losses, or whether any of these risks were even quantified.

201.  Eighth, the Board's stated reliance upon the stale 2014 report generated in response to an earlier shareholder demand (the "Cardiff demand") upon GM is unreasonable and demonstrates that the investigation of the Carro demand was not the

79

product of good faith and due care and did not reach a reasonable result. Any purported "update" by Wachtell Lipton of the stale 2014 report is meaningless as (a) Wachtell Lipton is and was hopelessly conflicted for the reasons alleged herein, and (2) the Cardiff demand report was formed over a year before the DPA and other key facts regarding the ignition switch defect controversy came to light. Furthermore, there is no indication that any purported "update" was generated regarding claims against any individuals other than Barra, Akerson, Millikin or Calabrese. Finally, all indications from the Refusal Letter are that defendant Barra was *permitted to vote* to reject the Cardiff demand, notwithstanding her own role in the chain of command and the ignition switch disaster as Senior Vice President, Global Product Development from 2011 to 2013, and then Executive Vice President, Global Product Development, Purchasing & Supply Chain from August 2013, until her January 15, 2014 appointment as CEO.

202.  Ninth, the Board's failure to make the underlying report on the Carro demand public, and its refusal to voluntarily provide a copy thereof to plaintiff upon request, demonstrates that the underlying investigation was not the product of good faith and due care and did not reach a reasonable result.

203.  Under these circumstances, plaintiff must act to prosecute the Company's claims.

# COUNT I

# BREACH OF FIDUCIARY DUTY

## (Against the Individual Defendants)

204.  Plaintiff incorporates by reference the allegations set forth above.

205.  Each of the Individual Defendants was an officer of GM during relevant times, and as such owed to the Company fiduciary obligations. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision in connection with the rampant violations at GM in connection with the ignition switch defect. The Individual Defendants acted intentionally, recklessly, and/or with gross negligence.

206.  Furthermore, the Individual Defendants failed to disclose, or caused the Company to fail to disclose, material information and/or made material misstatements to shareholders regarding the Company's business, financial condition, and revenue recognition. These Individual Defendants either knew, or recklessly or with gross negligence disregarded, that the statements alleged herein about GM's business, its financial condition, and revenue were false and misleading when made.

207.  The Individual Defendants ignored obvious and pervasive problems with GM's internal controls and safety procedures alleged herein, and by deliberate, reckless and/or grossly negligent indifference failed to make a good faith effort to correct the problems until it was far too late.

208.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, GM has sustained significant damages, not only monetarily as alleged herein, but also to its corporate reputation and goodwill.

209.   As a result of the misconduct alleged herein, defendants are liable to GM.

## COUNT II

## CONTRIBUTION AND INDEMNIFICATION

### (Against the Individual Defendants)

210.   Plaintiff incorporates by reference the allegations set forth above.

211.   GM is liable to private and public persons, entities, and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to the Individual Defendants' liability to GM.

212.   GM's alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or grossly negligent acts or omissions of the Individual Defendants.

213.   GM is entitled to contribution and indemnification from each of the Individual Defendants in connection with all such claims that have been, are, or may in the future be asserted against GM by virtue of the Individual Defendants' wrongdoing.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of GM, demands judgment as follows:

A.      Determining that this suit is a proper derivative action and certifying plaintiff as an appropriate representative of GM for said action;

B.      Declaring that the Individual Defendants have violated their fiduciary duties to GM and its shareholders;

C.      Awarding GM the damages sustained by GM as a result of the Individual Defendants' breaches of fiduciary duties, in an amount to be determined at trial, together with pre-judgment and post-judgment interest;

D.      Equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including (a) the institution of appropriate corporate governance reforms and internal control improvements to remediate and prevent the recurrence of the misconduct alleged herein, and (b) attaching, impounding, imposing a constructive trust on, or otherwise restricting the Individual Defendants' assets so as to assure that plaintiff has an effective remedy;

E.      Awarding plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 6, 2017                     Respectfully submitted,

                                         /s/ *Matthew M. Stroh*
                                         Matthew M. Stroh
                                         **MORGANTI LEGAL**
                                         535 Griswold Street, Suite 111-181
                                         Detroit, MI 48226
                                         (416) 970-0852
                                         mstroh@morgantilegal.com

                                         *Local Counsel for Plaintiff*

**SCHUBERT JONCKHEER & KOLBE LLP**
Robert C. Schubert
Willem F. Jonckheer
Dustin L. Schubert
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

*Counsel for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 6th day of March, 2017, I electronically filed the foregoing paper

with the Clerk of the Court which will send notification of such filing to all counsel of record.

Respectfully submitted,

/s/ *Matthew M. Stroh*
Matthew M. Stroh
**MORGANTI LEGAL**
535 Griswold Street, Suite 111-181
Detroit, MI 48226
(416) 970-0852
mstroh@morgantilegal.com

*Local Counsel for Plaintiff*